Filed 6/2/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, )
)     S188238
v. )
)     Ct.App. 2/7 B216917
CHARLES ELMORE, )
)     Los Angeles County
    Defendant and Appellant. )     Super. Ct. No. TA090607
_____ )

A killing committed because of an unreasonable belief in the need for self-defense is voluntary manslaughter, not murder. "Unreasonable self-defense, also called imperfect self-defense, 'obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.' (*People v. Rios* (2000) 23 Cal.4th 450, 461.)" (*People v. Beltran* (2013) 56 Cal.4th 935, 951.)

The question here is whether the doctrine of unreasonable self-defense is available when belief in the need to defend oneself is entirely delusional. We conclude it is not. No state, it appears, recognizes "delusional self-defense" as a theory of manslaughter. We have noted that unreasonable self-defense involves a mistake of *fact*. (*In re Christian S.* (1994) 7 Cal.4th 768, 779, fn. 3 (*Christian S.*).) A purely delusional belief in the need to act in self-defense may be raised as a defense, but that defense is insanity. Under our statutory scheme, a claim of

insanity is reserved for a separate phase of trial.  At a trial on the question of guilt, the defendant may not claim unreasonable self-defense based on insane delusion.

## I.  BACKGROUND

The relevant facts are undisputed.  Defendant was, by all accounts, mentally ill.  He had repeatedly been institutionalized and diagnosed as psychotic.  On the day of the killing, he was living in a rehabilitation center.  While visiting his grandmother's house that morning, he became fidgety and anxious.  At one point, he began to crawl under cars as his family and a friend tried to speak with him.  He left his grandmother's home around 12:30 p.m.

Meanwhile, 53-year-old Ella Suggs was doing her weekend shopping.  She wore a necklace with a charm in the shape of a turtle, which had a magnifying glass in place of the shell.  She also wore reading glasses on a chain around her neck.  About 1:00 p.m., Brandon Wilson looked out a restaurant window and noticed Suggs sitting at a bus stop across the street.  He saw defendant walk past Suggs, stop, look in both directions, and return to confront her.  Defendant did not seem to be talking to himself.

Defendant grabbed Suggs and appeared to pull on something around her neck.  Suggs raised her hands defensively, stood, and tried to walk away.  Defendant pushed her back to a seated position, brought his hands together over his head, and plunged them toward Suggs's chest.  Then he fled, looking around as he ran.  Suggs stood for a moment before falling.  She had been stabbed with a paintbrush handle sharpened to a point.  The weapon penetrated six or seven inches, through a lung and into her heart.  Neither the turtle necklace nor the reading glasses were found at the scene or among Suggs's possessions.

Within half an hour, Wilson saw defendant return and approach the bus stop.  He appeared to be puzzled, and fled.  After Wilson alerted a security officer,

2

police apprehended defendant. It took four officers to subdue him. His behavior was sufficiently bizarre that he was referred for psychiatric evaluation.

Charged with murder, defendant pleaded both not guilty and not guilty by reason of insanity. At the guilt phase, forensic psychiatrists were called by both prosecution and defense. They agreed that defendant suffered from schizophrenia, but disputed whether he was actively psychotic when he stabbed Suggs.

Defendant testified, and gave a confused account of the killing. On direct examination, he repeatedly said, "something went wrong out there in the street." When asked for detail, he said, "Somebody was saying something violent to me, and I didn't really — it was something violent happening while I was out there." Defense counsel pursued the question of who was violent. Defendant said, "Some person out there," but could not say whether the person was a man or a woman. He claimed to have blacked out. Counsel asked, "Did you pick that paint brush off the ground?" Defendant said, "Yeah, I made an object." "What was it?" counsel asked. "I made an object after I was out on the ground dazed somewhere. After I was on the ground or whatever. However it happened." Defendant admitted using the object but refused to say how. Asked if he stabbed someone with it, he responded, "I suppose." When asked why he stabbed Suggs, defendant answered, "Person said something and did something to me, I didn't just go do it to be doing it." Defendant refused to say what had been done to him, and denied taking anything from Suggs.

The prosecutor was no more successful at eliciting a coherent version of the events. Defendant said that when he was at the bus stop, "They said something to me." He denied asking Suggs for money or being angry that she would not give him any. He admitted making the paintbrush into a weapon "after I got up. I was mad and scared." He then said he did not know if he had made it and thought he

3

picked it up in that condition.[1] He admitted stabbing Suggs, but claimed the act was unintentional. He denied trying to steal anything.

The prosecutor argued for first degree murder, relying on both malice aforethought and felony murder theories. The defense requested jury instructions on unreasonable self-defense (CALCRIM No. 571), mistake of fact (CALCRIM No. 3406), and the effect of hallucination on the degree of murder (CALCRIM No. 627). The court refused those requests, but did tell the jury to consider the evidence of defendant's mental illness in deciding whether he had acted with malice or the intent to rob Suggs. (CALCRIM No. 3428.)

The jury returned a first degree murder conviction. After the guilt phase, against the advice of counsel, defendant withdrew his plea of not guilty by reason of insanity and was sentenced to 25 years to life in prison. On appeal, he challenged the court's refusal to instruct on unreasonable self-defense and hallucination. The Court of Appeal summarily rejected his argument on unreasonable self-defense, relying on *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437 (*Mejia-Lenares*) for the rule that the doctrine does not apply when belief in the need for self-defense arises solely from the defendant's delusional mental state. However, the court held that the refusal to instruct on hallucination was prejudicial error. It remanded with directions for retrial or a conviction of second degree murder, at the prosecutor's election.[2]

_____

[1] Paintbrushes of the same kind, though not sharpened, were available to the residents at defendant's rehabilitation facility.

[2] The Attorney General has not sought review. Thus, we have no occasion to consider this aspect of the Court of Appeal's judgment.

In this court, defendant contends he was entitled to an instruction on unreasonable self-defense. He does not claim there was any factual basis for him to believe he had to defend himself. His argument is that unreasonable self-defense may be based solely on a defendant's delusional mental state. The same question was raised in *People v. Wright* (2005) 35 Cal.4th 964, but there we deemed it unnecessary to reach the issue. We granted defendant's petition for review in order to settle the question.

## II. DISCUSSION

A. *The Law of Homicide and Unreasonable Self-defense*

Homicide, the killing of one human being by another, is not always criminal. In certain circumstances, a killing may be excusable or justifiable. (Pen. Code, § 195 et seq.;[3] see 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against the Person, § 96, pp. 885-886.) Murder and manslaughter are the forms of criminal homicide. "Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice aforethought may be express or implied. (§ 188.)

The Penal Code defines express malice as "a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) In *Christian S.*, we explained that this "inartful language" means the defendant must intend to act unlawfully, or in other words, have a " 'wrongful intent.' " (*Christian S.*, *supra*, 7 Cal.4th at p. 778.) We rejected the argument that malice turns on whether the *killing* is deemed lawful, without regard to the defendant's intent. (*Id*. at pp. 778-779.) However, the defendant need not intend to break the law or commit a crime.

---

[3]    Further unspecified statutory references are to the Penal Code.

Rather, malice requires an *intent to kill* that is "unlawful" because the law deems it so. " 'The adverb "unlawfully" in the express malice definition means simply that there is no justification, excuse, or mitigation for the killing recognized by the law.' " (*People v. Saille* (1991) 54 Cal.3d 1103, 1115.)

Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger. (§ 188; *People v. Gonzalez* (2012) 54 Cal.4th 643, 653; *People v. Knoller* (2007) 41 Cal.4th 139, 151-152.)

"A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder." (*People v. Beltran*, *supra*, 56 Cal.4th at p. 942.) "Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller*, *supra*, 41 Cal.4th at p. 151.) Thus, the mens rea required for murder is malice, express or implied. (*Beltran*, at p. 942.)

Manslaughter, a lesser included offense of murder, is an unlawful killing without malice. (§ 192; *People v. Thomas* (2012) 53 Cal.4th 771, 813.) Section 192 establishes three kinds of manslaughter: voluntary, involuntary, and vehicular. Only voluntary manslaughter is at issue here. Punishment is mitigated for this offense, which the law deems less blameworthy than murder because of the attendant circumstances and their impact on the defendant's mental state. Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense. (*People v. Beltran*, *supra*, 56 Cal.4th at pp. 942, 951; *People v. Blakeley* (2000) 23 Cal.4th 82, 87-88.) Heat of passion is recognized by statute as a mitigating factor. (§ 192, subd. (a).) Unreasonable self-defense is founded on both statute and the common law. (*People v. Anderson* (2002) 28 Cal.4th 767, 782.)

6

Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime. (§ 197, subd. 3; see 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Defenses, § 67 et seq., p. 507 et seq.) A killing committed when that belief is *unreasonable* is not justifiable. Nevertheless, "one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter." (*People v. Flannel* (1979) 25 Cal.3d 668, 672 (*Flannel*).) We have also described this mental state as an "unreasonable but good faith belief" in the need for self-defense. (E.g., *People v. Barton* (1995) 12 Cal.4th 186, 199.) However, it is most accurately characterized as an *actual* but unreasonable belief.[4]

" 'A person who actually believes in the need for self-defense necessarily believes he is acting lawfully.' [Citation.] Because express malice requires an intent to kill unlawfully, a killing in the belief that one is acting lawfully is not malicious.[5] The statutory definition of implied malice does not contain similar language, but we have extended the imperfect self-defense rationale to any killing that would otherwise have malice, whether express or implied." (*People v. Anderson*, *supra*, 28 Cal.4th at p. 782.) "A defendant who acts with the

---

**4** As noted in *Christian S.*, *supra*, 7 Cal.4th at page 773, the " '*actual belief* ' " formulation "avoids the confusing suggestion inherent in the phrase 'honest belief' that a person could have a 'dishonest belief,' i.e., that a person could believe something he does not believe."

**5** This rationale for the negation of malice is limited to the doctrine of unreasonable self-defense. It does not, for example, apply more broadly to claims of mistake of fact under section 26, or to mistakes of law regarding the use of deadly force. (*Christian S.*, *supra*, 7 Cal.4th at p. 779, fn. 3.)

requisite actual belief in the necessity for self-defense does not act with the base motive required for implied malice . . . ." (*Christian S.*, *supra*, 7 Cal.4th at p. 780, fn. 4; accord, *People v. Blakeley*, *supra*, 23 Cal.4th at p. 88.)[6] Unreasonable self-defense is "not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter." (*People v. Barton*, *supra*, 12 Cal.4th at p. 200.) Whenever there is substantial evidence that the defendant killed in unreasonable self-defense, the trial court must instruct on this theory of manslaughter. (*Id.* at p. 201.)

Here, defendant claims his request for an instruction on unreasonable self-defense should have been granted, even though his perception of a threat was entirely delusional. The claim fails, under both case law and statute. California cases reflect the understanding that unreasonable self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance alone. And the statutory scheme, though it permits evidence of mental illness to show that the defendant did not harbor malice, reserves the issue of legal insanity for a separate phase of trial. As shall be seen, a belief in the need for self-defense that is purely delusional is a paradigmatic example of legal insanity.

B. *Case Law*

The difference between unreasonable self-defense and a claim that mental deficiency prevented the formation of malice was made clear in *Christian S.*, *supra*, 7 Cal.4th 768. There we considered whether the Legislature intended to do

---

**6**     Malice is imputed in cases of felony murder, and unreasonable self-defense has no application in such cases. (*People v. Rios* (2000) 23 Cal.4th 450, 460, fn. 6; see *People v. Chun* (2009) 45 Cal.4th 1172, 1184; *People v. Cavitt* (2004) 33 Cal.4th 187, 197.)

away with unreasonable self-defense when it abolished the defense of diminished capacity, in 1981.  Diminished capacity was a judicially created concept.  It allowed defendants to argue that because of mental infirmity, they lacked "awareness of the obligation to act within the general body of laws regulating society," and therefore were incapable of acting with malice.  (*People v. Conley* (1966) 64 Cal.2d 310, 322 (*Conley*); see *Christian S.*, *supra*, 7 Cal.4th at p. 774.)

In *Christian S.*, we concluded that the Legislature did not mean to abrogate unreasonable self-defense along with diminished capacity.  (*Christian S.*, *supra*, 7 Cal.4th at p. 783.)  In reaching that conclusion, we firmly distinguished the two theories.  "The doctrine of imperfect self-defense had a lineage independent of the notion of mental capacity set forth in *Conley*, *supra*, 64 Cal.2d 310.  In *Flannel* . . . , *supra*, 25 Cal.3d 668, we traced the long development of the doctrine in California courts.  (*People v. Wells* (1949) 33 Cal.2d 330; *People v. Lewis* (1960) 186 Cal.App.2d 585; *Roads v. Superior Court* (1969) 275 Cal.App.2d 593; *People v. Sedeno* (1974) 10 Cal.3d 703.)  Indeed, 30 years before the diminished-capacity defense was allowed, a California court approved the imperfect self-defense doctrine:  ' "[I]f the act is committed under the influence of an uncontrollable fear of death or great bodily harm, caused by the circumstances, but without the presence of all the ingredients necessary to excuse the act on the ground of self-defense, the killing is manslaughter" [citation].'  (*People v. Best* (1936) 13 Cal.App.2d 606, 610.)"  (*Christian S.*, at p. 776.)

*Flannel*, we noted, had rejected the idea that " 'the doctrine of unreasonable belief is necessarily bound up with or limited by the concepts of either heat of passion *or diminished capacity*.' "  (*Christian S.*, *supra*, 7 Cal.4th at p. 777, quoting *Flannel*, *supra*, 25 Cal.3d at p. 677.)  "The two doctrines relate to the concept of malice, but the similarity ends there.  Unlike diminished capacity,

9

imperfect self-defense is not rooted in any notion of mental capacity or awareness of the need to act lawfully." (*Christian S.*, *supra*, 7 Cal.4th at pp. 777-778.)

Thus, unreasonable self-defense is not premised on considerations of mental disorder. From its earliest appearance in California law, unreasonable self-defense has been deemed to apply when the defendant's act was " '*caused by the circumstances*,' " rather than by cognitive defects alone. (*People v. Best*, *supra*, 13 Cal.App.2d at p. 610, italics added; see *Christian S.*, *supra*, 7 Cal.4th at p. 776; *Flannel*, *supra*, 25 Cal.3d at p. 676; *People v. Lewis*, *supra*, 186 Cal.App.2d at p. 598.) As we said in *Christian S.*, unreasonable self-defense "is based on a defendant's assertion that he lacked malice . . . because he acted under an unreasonable *mistake of fact* — that is, the need to defend himself against imminent peril of death or great bodily harm." (*Christian S.*, *supra*, 7 Cal.4th at p. 779, fn. 3, italics added.)

In *Mejia-Lenares*, *supra*, 135 Cal.App.4th 1437, the Court of Appeal relied on *Christian S.* in holding that purely delusional acts are excluded from the scope of unreasonable self-defense. The court noted that California cases involving delusional defendants tended to be treated under the rubric of diminished capacity, when that doctrine was viable, whereas cases involving factual misperceptions were analyzed in terms of unreasonable self-defense. (*Mejia-Lenares*, at pp. 1448-1449.) *Mejia-Lenares* reasoned that because unreasonable self-defense is "a species of mistake of fact (see [*Christian S.*, *supra*, 7 Cal.4th] at p. 779, fn. 3) . . . it cannot be founded on delusion. In our view, a mistake of fact is predicated upon a negligent perception of facts, not, as in the case of a delusion, a perception of

10

facts not grounded in reality.[7] A person acting under a delusion is not negligently interpreting actual facts; instead, he or she is out of touch with reality." (*Mejia-Lenares*, *supra*, 135 Cal.App.4th at pp. 1453-1454.)

We agree with the *Mejia-Lenares* court that unreasonable self-defense, as a form of mistake of fact, has no application when the defendant's actions are entirely delusional. A defendant who makes a factual mistake misperceives the objective circumstances. A delusional defendant holds a belief that is divorced from the circumstances. The line between mere misperception and delusion is drawn at the absence of an objective correlate. A person who sees a stick and thinks it is a snake is mistaken, but that misinterpretation is not delusional. One who sees a snake where there is nothing snakelike, however, is deluded.

---

**7** "A delusion is defined as 'something that is falsely or delusively believed or propagated . . . as . . . a false conception and persistent belief unconquerable by reason in something that has no existence in fact [or] a false belief regarding the self or persons or objects outside the self that persists despite the facts . . . .' (Webster's 3d New Internat. Dict. (1986) p. 598.)"

The Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) defines delusions as "fixed beliefs that are not amenable to change in light of conflicting evidence." (*Id*. at p. 87; see also Dorland's Illustrated Medical Dict. (30th ed. 2003) p. 486 ["a false belief that is firmly maintained in spite of incontrovertible and obvious proof or evidence to the contrary . . ."]; Stedman's Medical Dict. (27th ed. 2000) p. 470 ["A false belief or wrong judgment held with conviction despite incontrovertible evidence to the contrary"].) The *Mejia-Lenares* court employed the term "delusion" broadly, to include hallucinations. (*Mejia-Lenares*, *supra*, 135 Cal.App.4th at pp. 1445-1446; see *People v. Padilla* (2002) 103 Cal.App.4th 675, 678 ["A hallucination is a perception with no objective reality"].) We too use the term in an inclusive sense. The question presented on this appeal is whether unreasonable self-defense may be based solely on a psychotic delusion. Both delusions and hallucinations are hallmarks of psychotic disorder. (See Diagnostic and Statistical Manual of Mental Disorders, *supra*, at p. 87.)

Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind.

Defendant claims this limitation is inconsistent with our decision in *People v. Wells*, *supra*, 33 Cal.2d 330 (*Wells*). It is not; delusion was not a factor in *Wells*. Unlike most cases of unreasonable self-defense, *Wells* was not a homicide case but the prosecution of a prison inmate for assault with malice aforethought under section 4500.[8] (*Wells*, at p. 334.) Wells had been ejected from a disciplinary hearing for disrupting the proceedings. In the hall outside, he encountered the guard who had brought charges against him. Wells "seized a heavy crockery cuspidor and threw it" at the guard, severely injuring him. (*Id.* at p. 338.)

Wells testified that he had no intent to hit the guard, but only picked up the cuspidor to defend himself from another guard who struck him with a baton. The blow caused him to fall and release the cuspidor. (*Wells*, *supra*, 33 Cal.2d at p. 339.) The defense also offered testimony from prison physicians that Wells suffered from an abnormal physical and mental condition, not amounting to insanity. According to the doctors, he was in a state of tension that rendered him highly sensitive to external stimuli and abnormally fearful for his personal safety. As a result, he reacted to apparent threats more violently and unpredictably than an average person would. (*Id.* at pp. 344-345.) This court reasoned that if Wells had "acted only under the influence of fear of bodily harm, in the belief, honest though

---

[8] "Every person while undergoing a life sentence, who is sentenced to state prison within this state, and who, with malice aforethought, commits an assault upon the person of another with a deadly weapon or instrument, or by any means of force likely to produce great bodily injury is punishable with death or life imprisonment without possibility of parole." (§ 4500.)

unreasonable, that he was defending himself from such harm by the use of a necessary amount of force, then . . . the essential element of 'malice aforethought' would be lacking." (*Id.* at p. 345; see § 4500.)

Defendant argues that Wells's attack on a prison guard was completely unprovoked, with no objective circumstances supporting the claim of unreasonable self-defense. He misreads the case. As noted in *Mejia-Lenares*, Wells held a "belief which, although skewed by mental illness, was nevertheless factually based." (*Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1449.) There was no evidence that Wells's perception of a threat was delusional. To the contrary, he claimed his actions were an attempt to defend himself from an actual baton-wielding guard. (*Wells*, *supra*, 33 Cal.2d at p. 339.) The expert testimony was that Wells was abnormally sensitive to *external stimuli*. (*Id*. at pp. 344-345.) *Wells* does not support defendant's claim that unreasonable self-defense requires no objective basis.

Defendant also places great weight on this statement in *Flannel*, *supra*, 25 Cal.3d 668: "*No matter how the mistaken assessment is made*, an individual cannot genuinely perceive the need to repel imminent peril or bodily injury and simultaneously be aware that society expects conformity to a different standard." (*Id*. at p. 679, italics added.) Defendant contends delusions are necessarily included in *Flannel*'s expansive characterization of the misperceptions that may motivate an act of unreasonable self-defense. However, the comment on which he relies was predicated on a concept of malice that was central to the diminished capacity defense. The Legislature has specifically repudiated that concept. Section 188, as amended in 1981 and revised in 1982, declares that "[n]either an awareness of the obligation to act within the general body of laws regulating society nor acting despite such awareness is included within the definition of

13

malice." (See Stats. 1981, ch. 404, § 6, p. 1593; Stats. 1982, ch. 893, § 4, p. 3318.)

In *Christian S.*, we observed that *Flannel*'s discussion of unreasonable self-defense "had two *independent* premises: (1) the notion of mental capacity set forth in *Conley*, *supra*, 64 Cal.2d 310, 322 [i.e., diminished capacity], and (2) a grounding in both well-developed common law and in the statutory requirement of malice (. . . § 187). The 1981 amendments make clear the Legislature intended to eliminate the notion of diminished capacity. Thus, that part of the reasoning in *Flannel* . . . is no longer valid. But, *Flannel*'s other premise was not affected by the amendments." (*Christian S.*, *supra*, 7 Cal.4th at p. 777; see *Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1454.) Defendant seeks support from the part of *Flannel*'s discussion that is now invalid. In the surviving aspect of its analysis, based on the common-law and statutory roots of unreasonable self-defense, *Flannel* incorporated the observation made in *People v. Best*, *supra*, 13 Cal.App.2d at page 610, that unreasonable self-defense entails a reaction that is " ' "caused by the circumstances." ' " (*Flannel*, *supra*, 25 Cal.3d at p. 676; see *Christian S.*, at p. 776.)

The phrase "caused by the circumstances" denotes a motivation arising from objective facts, not delusions. Accordingly, *Flannel* comports with our view that purely delusional perceptions of threats to personal safety cannot be relied upon to claim unreasonable self-defense. This understanding of the doctrine is consistently reflected in the decisions of other state courts.[9]

---

[9] See *State v. Ordway* (Kan. 1997) 934 P.2d 94, 104 ("the 'unreasonable but honest belief' necessary to support the 'imperfect right to self-defense manslaughter' cannot be based upon a psychotic delusion"); *Commonwealth v.*

*(footnote continued on next page)*

14

C. *Statute*

Defendant asserts a statutory basis for his claim in section 28, subdivision (a) (hereafter, section 28(a)). This provision states that evidence of mental disorders is admissible "on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged," a theory sometimes referred to as "diminished actuality." (See *People v. Mills* (2012) 55 Cal.4th 663, 671 (*Mills*).) Section 28(a) bars evidence of the defendant's *capacity* to form a required mental state, consistent with the abolition of the diminished capacity defense.[10]

---

*(footnote continued from previous page)*

*Sheppard* (Pa.Super.Ct. 1994) 648 A.2d 563, 567 (imperfect self-defense "does not contemplate diagnosed mental disorders as a shield to a defendant . . . but rather speaks to a misperception of the factual circumstances"), accord, *Commonwealth v. Sepulveda* (Pa. 2012) 55 A.3d 1108, 1126; *Peterson v. State* (Md.Ct.Spec.App. 1994) 643 A.2d 520, 522 (rejecting claim that imperfect self-defense requires no more than subjective honest belief, and holding that "the imperfect self-defense instruction should not be given unless the evidence generates the issue of whether, under the circumstances, the defendant was entitled to take *some* action against the victim"); *State v. Seifert* (Wis. 1990) 454 N.W.2d 346, 352 ("The doctrine of imperfect self-defense manslaughter was simply never intended to cover situations . . . where it is entirely the defendant's mental disease or defect, not an error in judgment or perception or a negligently-formed perspective of the situation, that motivates the defendant's actions").

[10] Section 28(a) provides: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a

*(footnote continued on next page)*

15

Defendant contends the plain language of section 28(a) permits him to introduce evidence of the mental disorder that gave rise to his belief in the need for self-defense, and precluded him from actually harboring malice. If section 28(a) is viewed in isolation, this construction is logically defensible. However, it is unsustainable when the provision is considered in light of the statutory scheme governing evidence of mental illness, and the legislative history of section 28.

" '[T]he "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a measure comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute.' [Citation.] [¶] The language is construed in the context of the statute as a whole and the overall statutory scheme, and we give 'significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose. [Citation.]' [Citations.] The intent of the law prevails over the letter of the law, and ' "the letter will, if possible, be so read as to conform to the spirit of the act." ' " (*People v. Canty* (2004) 32 Cal.4th 1266, 1276-1277.)

Under California's statutory scheme, "[p]ersons who are mentally incapacitated" are deemed unable to commit a crime as a matter of law. (§ 26, par. Two.) Mental incapacity under section 26 is determined by the *M'Naghten* test for legal insanity provided in section 25, subdivision (b). (*M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722; *People v. Phillips* (2000) 83 Cal.App.4th 170, 173; see Stats. 2007, ch. 31, § 5, pp. 138-139.) Under *M'Naghten*, insanity is

_____

*(footnote continued from previous page)*

required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

16

established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed. (§ 25, subd. (b); *Mills*, *supra*, 55 Cal.4th at p. 671; *People v. Skinner* (1985) 39 Cal.3d 765, 775-777 (*Skinner*).)[11]

A claim of unreasonable self-defense based solely on delusion is quintessentially a claim of insanity under the *M'Naghten* standard of inability to distinguish right from wrong. Its rationale is that mental illness caused the defendant to perceive an illusory threat, form an actual belief in the need to kill in self-defense, and act on that belief without wrongful intent. (*People v. Anderson*, *supra*, 28 Cal.4th at p. 782; *Christian S.*, *supra*, 7 Cal.4th at pp. 778, 780, fn. 4.) In *M'Naghten's Case* itself, the judges observed: "[I]f under the influence of [a] delusion [the defendant] supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment." (*M'Naghten's Case*, *supra*, 8 Eng.Rep. at p. 723; *Skinner*, *supra*, 39 Cal.3d at p. 781, fn. 13.) We noted in *Skinner* that this example "applies the right/wrong prong of the M'Naghten test to an insane delusion in the same manner as it is applied to other forms of insanity. The delusion . . . results in an inability to appreciate that the act is wrong. The defendant believes he is defending himself." (*Skinner*, at p. 781, fn. 13.)

Thus, what defendant attempted here was to assert a claim of legal insanity at the guilt phase of his trial. That is not allowed under our statutes. Section 1026 sets out the applicable procedure when, as in this case, the defendant pleads both not guilty and not guilty by reason of insanity. The trial is bifurcated, with the

---

[11]     We note that legal "insanity" is a term of art, defined by statute in conformity with the *M'Naghten* rule. It may differ from medical or popular usage.

17

question of guilt tried first.  The defendant is presumed innocent, of course, but in order to reserve the issue of sanity for the second phase of trial the defendant is also conclusively presumed to have been legally sane at the time of the offense. (§ 1026, subd. (a); *Mills*, *supra*, 55 Cal.4th at p. 681.)[12]  Evidence of the defendant's mental state may not be admitted at the guilt phase to prove insanity. (§ 1020; *Mills*, at p. 672.)[13]  If the defendant is found guilty, the trial proceeds to the sanity phase, where the defendant bears the burden of proof by a preponderance of the evidence.  (§§ 1026, subd. (a), 25, subd. (b).)  "The separation of the two stages of the bifurcated trial is solely for the purpose of keeping the issues of guilt and sanity distinct; for other purposes, the trial is regarded as single and continuing."  (5 Witkin & Epstein, Cal. Criminal Law, *supra*, Criminal Trial, § 795, p. 1227; see *Wells*, *supra*, 33 Cal.2d at p. 349.)

In *Mills*, we held that the jury should not be instructed on the presumption of sanity at the guilt phase, because the question of legal sanity is then irrelevant. (*Mills*, *supra*, 55 Cal.4th at pp. 680-681.)  "The Legislature's intent in providing for bifurcation when a defendant pleads both not guilty and not guilty by reason of insanity was to *simplify* the issues before the jury, by 'remov[ing] entirely from the first stage of the trial any issue as to legal sanity.'  (*Wells*, *supra*, 33 Cal.2d at p.

---

[12]     The conclusive presumption of sanity applies as well when the defendant pleads not guilty without also entering an insanity plea.  (§ 1016.)  A defendant who enters only an insanity plea concedes commission of the criminal act. (*People v. Hernandez* (2000) 22 Cal.4th 512, 521; *Wells*, *supra*, 33 Cal.2d at p. 349.)

[13]     Section 1020 provides, in relevant part:  "All matters of fact tending to establish a defense other than one specified in the . . . sixth subdivision[] of Section 1016, may be given in evidence under the plea of not guilty."  Subdivision 6 of section 1016 authorizes the plea of not guilty by reason of insanity.

352.)" (*Mills*, at p. 681.) Therefore, it is improper for the jury to weigh the presumption of sanity during deliberations on the question of guilt. (*Ibid*.) However, it is equally improper for the jury to consider whether the defendant was legally insane under *M'Naghten*. Whether mental disease or defect prevented the defendant from understanding the nature and quality of the criminal act, or appreciating its wrongfulness, are questions relevant only at a sanity trial. (§§ 25, subd. (b), 1016, 1020, 1026, subd. (a); *Mills*, at pp. 671-672.)

Section 28(a) allows defendants to introduce evidence of mental disorder to show they did not actually form a mental state required for guilt of a charged crime. But the scope of the diminished actuality defense is necessarily limited by the presumption of sanity, which operates at a trial on the question of guilt to bar the defendant from claiming he is not guilty *because he is legally insane*. This limitation was explored in *Wells*, *supra*, 33 Cal.2d 330. Although *Wells* predated the enactment of section 28, its analysis established the distinction between *actual* formation of a mental state and *capacity* to form a mental state that is now found in section 28(a).[14]

"Whenever a particular mental state, such as a specific intent, is by statute made an essential element of a crime, that specific state must be proved like any other fact. [Citations.] Since, however, the mental capacity to commit the crime

---

[14]     *Wells* has been described as "[t]he first step in the development of the diminished capacity doctrine" (*People v. Saille*, *supra*, 54 Cal.3d. at p. 1109), and the diminished capacity defense was sometimes called the " '*Wells-Gorshen* rule' " (1 Witkin & Epstein, Cal. Criminal Law, *supra*, Defenses, § 26, p. 454; see *People v. Gorshen* (1959) 51 Cal.2d 716). Nevertheless, as discussed above, *Wells* went no further than recognizing the concept of diminished *actuality* that is now codified in section 28.

19

— insofar as legal sanity is concerned — is conclusively presumed at the first section of the trial, it follows that the . . . general rule . . . must be deemed to be qualified to this extent:  That evidence tending to show lack of mental capacity to commit the crime because of legal insanity is barred at that stage.  This simply means that legal sanity is not in issue at the first stage of the trial and that the evidence must be confined to that which is pertinent to issues then being litigated." (*Wells*, *supra*, 33 Cal.2d at p. 350.)

Wells explained that evidence challenging the defendant's actual formation of a mental state is admissible, but only so long as it does not go toward a claim of legal insanity:  "As a general rule, on the not guilty plea, evidence . . . tending to show that the defendant, who at this stage is conclusively presumed sane, either *did* or *did not*, in committing the overt act, possess the specific essential mental state, is admissible, but evidence tending to show legal sanity or legal insanity is not admissible.  Thus, if the proffered evidence tends to show not merely that he *did* or *did not*, but rather that because of legal insanity he *could* not, entertain the . . . essential mental state, then that evidence is inadmissible under the not guilty plea and is admissible only on the trial on the plea of not guilty by reason of insanity. . . .  Evidence which tends to show legal insanity (likewise, sanity) is not admissible at the first stage of the trial because it is not pertinent to any issue then being litigated; but competent evidence, other than proof of sanity or insanity, which tends to show that a (then presumed) legally sane defendant either did or did not in fact possess the required specific intent or motive is admissible." (*Wells*, *supra*, 33 Cal.2d at pp. 350-351; see § 1020.)

To understand how *Wells*'s distinction between evidence of mental capacity and evidence of actual formation of a mental state came to be reflected in section 28(a), a brief historical review is necessary.  The *Wells* distinction was eroded in subsequent cases.  (*Mills*, *supra*, 55 Cal.4th at p. 671, see *People v. Wetmore*

(1978) 22 Cal.3d 318, 324-326 (*Wetmore*).)  In *Wetmore*, it was expressly disavowed:  "*Wells'* distinction between evidence that defendant *did not* entertain the requisite intent, which is admissible, and evidence that he *could not* entertain that intent, which is inadmissible, cannot be supported.  '[As] a matter of logic, any proof tending to show that a certain mental condition could not exist is relevant and should be admissible to show that it did not exist.  And, of course, proof that something could not exist is the best possible evidence that it did not exist.'  (Louisell & Hazard, *Insanity as a Defense: The Bifurcated Trial* (1961) 49 Cal.L.Rev. 805, 819.)"  (*Wetmore*, at p. 324.)

The *Wetmore* court recognized that its holding would "require the jury to hear the same evidence twice, once to determine diminished capacity and once to determine insanity."  (*Wetmore*, *supra*, 22 Cal.3d at p. 331.)  To avoid such a "pointless waste of judicial time and resources," the court invited the Legislature to "reconsider the wisdom of the statutes providing for bifurcated trial."  (*Ibid*.)  It suggested that "[t]he evidentiary duplication inherent in the present procedure could be eliminated either by a unitary trial [citations], or by a new method of bifurcation in which issues of diminished capacity and insanity are tried together at the second phase of the trial [citations]."  (*Ibid*.)

However, the Legislature roundly rejected *Wetmore*'s invitation.  It acted in 1981 to *preserve* the bifurcated trial statutes and *eliminate* the defense of diminished capacity.  At the same time the Legislature codified, in section 28(a), the distinction between capacity and actuality that was drawn in *Wells* and disparaged in *Wetmore*.  (Stats. 1981, ch. 404, § 4, p. 1592; see *People v. Saille*,

21

*supra*, 54 Cal.3d at p. 1111.)**15**  The following year, the voters adopted an initiative measure that again abolished the diminished capacity defense, and went further in the restoration of former law by reinstating the *M'Naghten* test for legal insanity.  That standard had prevailed in California from the earliest days of our statehood until this court replaced it with an alternative formulation in *People v. Drew* (1978) 22 Cal.3d 333, 345.  (See *Skinner*, *supra*, 39 Cal.3d at p. 768; *Saille*, *supra*, 54 Cal.3d at p. 1112.)

"As a result of these developments, the current state of California law on the insanity defense and proof of the defendant's mental state is generally consistent with the principles set out in *Wells*." (*Mills*, *supra*, 55 Cal.4th at

---

**15**    Defendant claims the legislative history of these amendments demonstrates an intent to allow claims of delusional self-defense.  He notes, as did this court in *Christian S.*, *supra*, 7 Cal.4th at page 781, that the Joint Committee for Revision of the Penal Code informed the Governor's office that "[t]he defenses of diminished capacity, diminished responsibility, and irresistible impulse are repealed," and therefore, "*except in the delusional self-defense kinds of cases*, there will have to be a showing of provocation, the traditional basis of manslaughter, to reduce murder to manslaughter." (Joint Com. for Revision of the Penal Code, letter to Governor's office (1981-1982 Reg. Sess.) Sept. 4, 1981, p. 2, Governor's chaptered bill files, ch. 404, italics added.)

We are not persuaded by this offhand reference.  As the *Mejia-Lenares* court observed, if taken literally it would bar claims of self-defense based on unreasonable mistakes of fact.  (*Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1455, fn. 24.)  We agree with *Mejia-Lenares* that "it is apparent the reference is to unreasonable self-defense situations." (*Ibid.*)  *Christian S.* made it clear that the Legislature's focus in the 1981 amendments was on abolition of the diminished capacity defense, not on unreasonable self-defense.  Indeed, we concluded that the Legislature intended no change in the law of unreasonable self-defense. (*Christian S.*, *supra*, 7 Cal.4th at pp. 775, 781-782.)  Because that doctrine was consistently understood to apply to factual misunderstandings, it follows that the Legislature did not mean to expand it to include claims of purely delusional self-defense. (*Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1455.)

22

p. 671.) Accordingly, the provisions of section 28(a) allowing evidence of diminished actuality are "qualified" by the caveat that at a trial on the question of guilt, "evidence tending to show lack of mental capacity to commit the crime because of legal insanity is barred . . . ." (*Wells*, *supra*, 33 Cal.2d at p. 350.) The *Wells* court squarely rejected the idea that defendants have the right to present evidence of insanity at the guilt phase to persuade the jury they did not entertain a required mental state. "The force which otherwise would attach to [that] argument," said the court, "is fully obviated by the provisions for trial on the issue of not guilty by reason of insanity. We are satisfied that the enactments [providing for a bifurcated trial and a presumption of sanity at the guilt phase] . . . are a valid exercise of legislative power and that the evidence to be received at the first stage of the trial is properly limited to the extent of excluding evidence tending to show either sanity or insanity." (*Wells*, at p. 353.)

The United States Supreme Court has confirmed that state law does not violate due process by "restricting consideration of defense evidence of mental illness and incapacity to its bearing on a claim of insanity, thus eliminating its significance directly on the issue of the mental element of the crime charged." (*Clark v. Arizona* (2006) 548 U.S. 735, 742.) It is clear that the scope of section 28(a) must be restricted as we have explained, given California's statutory requirement that guilt and sanity be tried separately.

The bifurcated approach offers substantial benefits to the defense. At the guilt phase, the prosecution must prove beyond a reasonable doubt each element of the offense, including mens rea. The defendant has the opportunity to obtain an acquittal or a verdict on a lesser included offense, without having to claim insanity and risk the prospect of involuntary commitment for psychiatric treatment. The defense has available the panoply of strategies open to legally sane defendants, including unreasonable self-defense based on mistake of fact. It may choose to

23

put on no evidence, or it may introduce any relevant and admissible evidence on the question of guilt. If the defendant is found not guilty, the trial is over. If there is a conviction, the trial moves to the second phase, devoted to the question of legal sanity. There the defendant bears the burden of proof by a preponderance of the evidence, and may be found not guilty by reason of insanity. This process affords the defense two chances at a favorable verdict.

However, the defense may not litigate the question of legal sanity at both phases. The defendant is presumed sane at the guilt phase, and cannot introduce evidence of insanity to counter the prosecution's showing of mens rea. A claim of self-defense based solely on delusion is more than a claim of unreasonable self-defense; as we have shown, it is a claim of legal insanity. If section 28(a) were applied to allow the defendant to make that claim at the guilt phase, the burden would shift to the prosecution to prove beyond a reasonable doubt that the defendant was not insane. The statutory scheme would be turned on its head.

We have recognized that the evidence of a defendant's mental state at the guilt and sanity phases "may be overlapping." (*People v. Hernandez*, *supra*, 22 Cal.4th at p. 520.) But the extent of the overlap is limited by the rule that "the defendant's sanity is *irrelevant* at the guilt phase and evidence tending to prove insanity, as opposed to the absence of a particular mental element of the offense, is *inadmissible*." (*Mills*, *supra*, 55 Cal.4th at p. 672.) The defendant may employ mental state evidence in different ways at the guilt and sanity phases, but may not make the same showing twice. (*Ibid*.) The *Wetmore* court acknowledged that the diminished capacity defense, once the limits imposed in *Wells* were removed, allowed the duplication of evidence at the guilt and sanity phases to "approach[] a totality." (*Wetmore*, *supra*, 22 Cal.3d at p. 331.) As noted above, the statutory amendments of 1981 and 1982 abolished that practice and effectively endorsed the distinctions and restrictions delineated in *Wells*. Among those restrictions is the

24

settled rule that "insanity . . . is either a complete defense or it is no defense at all." (*Wells*, *supra*, 33 Cal.2d at p. 349, citing cases.)

Accordingly, a claim of delusional belief in the need for self-defense is reserved for the sanity phase, where it may result in *complete exoneration* from criminal liability. (*M'Naghten's Case*, *supra*, 8 Eng.Rep. at p. 723; *Skinner*, *supra*, 39 Cal.3d at p. 781, fn. 13.) It may not be employed to *reduce* a defendant's degree of guilt. When the Legislature enacted section 28, it certainly did not intend to allow defendants to do what the *Wetmore* court had permitted: argue first that their mental condition made them guilty of a lesser crime, and then that the same condition made them not guilty at all by reason of insanity.[16]

Our construction of section 28(a) has no effect on evidence of mental disorders that do not amount to legal insanity. As noted in *Mills*, "a defendant may suffer from a diagnosable mental illness without being legally insane under the *M'Naghten* standard. (See 1 Witkin & Epstein, Cal. Criminal Law[, *supra*,] Defenses, § 17 et seq., p. 349 et seq.)" (*Mills*, *supra*, 55 Cal.4th at p. 672.) All relevant evidence of mental states short of insanity is admissible at the guilt phase under section 28(a), including evidence bearing on unreasonable self-defense, as in *Mills* and *Wells*. (*Mills*, at p. 678; *Wells*, *supra*, 33 Cal.2d at p. 346.) The *M'Naghten* test is a narrow one. It is only when "mental illness is manifested in delusions which render the individual incapable either of knowing the nature and character of his act, or of understanding that it is wrong, [that] he is legally insane

---

[16]     The approach taken by the concurring and dissenting opinion would permit defendants to make identical showings of delusional belief in the need for self-defense at both the guilt and sanity phases. The Legislature, however, has clearly rejected that option.

under the California formulation of the M'Naghten test." (*Skinner*, *supra*, 39 Cal.3d at p. 782.)

Furthermore, our holding does not prevent the defense from presenting evidence of mental disease, defect, or disorder to support a claim of unreasonable self-defense based on a mistake of fact. A defendant who misjudges the external circumstances may show that mental disturbance contributed to the mistaken perception of a threat, without presenting the jury with the same question it would confront at a sanity trial. The jury must find there was an actual, unreasonable belief in the necessity of self-defense based on the circumstances, and it should be so instructed. (See *People v. Tewksbury* (1976) 15 Cal.3d 953, 963.) An insanity defense, on the other hand, requires no showing that the defendant responded to objective circumstances. At a sanity trial, and only at a sanity trial, the defense can maintain that purely delusional perceptions caused the defendant to believe in the necessity of self-defense.

In sum, defendants who mistakenly believed that actual circumstances required their defensive act may argue they are guilty only of voluntary manslaughter, even if their reaction was distorted by mental illness. But defendants who contend they killed in self-defense because of a purely delusional perception of threat must make that claim at a sanity trial. Unreasonable self-defense and legal insanity are distinct theories, and must be adjudicated separately.

Here, defendant's claim of unreasonable self-defense was based entirely on a delusional mental state that amounted to legal insanity. The trial court properly denied his request for an instruction on unreasonable self-defense.

## III.  DISPOSITION

We affirm the Court of Appeal's judgment.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**BAXTER, J.**
**CHIN, J.**

**CONCURRING AND DISSENTING OPINION BY KENNARD, J.**<sup>*</sup>


Murder requires malice.  (Pen. Code, § 187, subd. (a) (all statutory citations are to the Penal Code).)  Malice is lacking when a person kills in the *reasonable* belief that the killing is necessary to avert an imminent threat of death or great bodily injury (self-defense); because the killing is justified, no crime is committed. Malice is also lacking when a person kills in the *unreasonable* belief that self-defense is necessary, a concept known as "imperfect self-defense"; in that situation the killing is voluntary manslaughter, a lesser offense necessarily included in murder.  (*In re Christian S.* (1994) 7 Cal.4th 768, 771 (*Christian S.*).) But what crime is committed when the unreasonable belief stems entirely from a delusion caused by a mental disorder?  The majority says the crime is murder.  I disagree.  In my view, the offense is voluntary manslaughter.   Although I agree with the majority that the trial court here properly rejected defendant's request for a jury instruction on voluntary manslaughter based on imperfect self-defense, I do so for different reasons (see pt. III, *post*).

---

\*     Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# I

In April 2007, defendant was living at a rehabilitation center in Los Angeles. In the late morning of April 29, defendant visited his grandmother and asked for money. When his grandmother said she had none, defendant left.

Shortly thereafter, from a restaurant window a mile and a half from the home of defendant's grandmother, Brandon Wilson saw the following: Ella Suggs (53 years old) was sitting on a bench at a bus stop across the street. Defendant walked past Suggs, looked in both directions, and returned to the bus stop. He then placed his hands near Suggs's neck and pulled down what Wilson thought was a necklace. When Suggs tried to get up and walk away, defendant "yanked" her back to the bench, raised his hands over his head, and brought them down on Suggs's chest area. Wilson exclaimed to his family: "There's an old lady . . . getting beat up on." His sister, Brittany Todd, then looked out the window and saw defendant running away.

When Los Angeles County Sheriff's deputies arrived, Suggs was dead. A single stab wound had penetrated her aorta, heart, and lungs. Near her body was a bloody paintbrush, its handle sharpened to a point. When defendant was arrested later that day in a nearby parking lot, he blurted out, "I didn't do it."

From jail, defendant called his uncle, Sheldon Daniels, who lived with defendant's grandmother. Defendant asked Daniels to "come to court and verify" that defendant was "there at the time" with Daniels.

Missing from victim Suggs's body was a necklace with a turtle pendant that she customarily wore; also missing were her reading glasses, which she usually wore around her neck on a gold chain. Those items were never found.

At defendant's jury trial for the murder of Suggs, psychiatrist Jack Rothberg testified for the defense that defendant suffered from schizophrenia, which Dr. Rothberg described as "a major mental condition marked by a

2

constellation of symptoms, including disturbances of thought and reasoning often associated with hallucinations . . . and delusions." In Dr. Rothberg's view, defendant was "psychotic" when he killed Suggs. Dr. Rothberg mentioned defendant's month-long stay in 2001 at a psychiatric hospital, followed some three years later by six months at another psychiatric hospital in connection with a criminal charge of stalking and a finding of incompetence to stand trial.

Sheldon Daniels (defendant's uncle) and Deniece Bonner (Daniels's girlfriend) testified that on the morning of the killing they saw defendant at the home of defendant's grandmother; defendant seemed "excited and agitated" and acted as if he were "on sherm."[1] They again saw defendant later that morning in a church parking lot. Bonner said that defendant did not talk rationally and for no apparent reason crawled under a car. Daniels and Bonner took defendant back to his grandmother's home, where Bonner gave defendant seven dollars and some bus tokens. Defendant then left.

Defendant testified that on the morning of Suggs's death, he had argued with the pastor at the rehabilitation center where defendant was living, and he was then asked to leave. He went to his grandmother's home and unsuccessfully asked her for some money. After leaving, he saw a Black woman at a bus stop. He said, without elaboration, that "somebody was saying something violent to me" and someone "did something to me," after which the stabbing occurred. He repeatedly insisted that he did not "intentionally" kill Suggs, but he offered no coherent explanation why he killed her.

In the prosecution's rebuttal, psychiatrist Kaushal Sharma testified that although defendant was schizophrenic, there was "no credible information" that he

---

[1]    "Sherm" is a street name for a cigarette laced with phencyclidine (PCP), a hallucinogenic drug. (See *In re Hardy* (2007) 41 Cal.4th 977, 1013.)

3

was "in a psychotic state" when he killed Suggs. On cross-examination by the defense, Dr. Sharma mentioned being told by defendant that just before the killing he was beaten with a crowbar at a bus stop by some unidentified persons. Defendant made no reference to any connection between the beating and his stabbing of Suggs.

Based on the defense theory that defendant stabbed Suggs because he unreasonably believed that he needed to defend himself (imperfect self-defense), defense counsel asked the trial court to instruct the jury on voluntary manslaughter, a lesser offense necessarily included within the charged crime of murder. (See CALCRIM No. 571.) The court refused to do so. After the jury found defendant guilty of first degree murder, the court sentenced him to a prison term of 25 years to life.

On appeal, defendant challenged the trial court's refusal to instruct the jury on imperfect self-defense. In upholding the trial court's ruling, the Court of Appeal stated that "the doctrine of imperfect self-defense does not apply where the subjective belief in the need to defend oneself arises not from objective circumstances but purely from the defendant's mental illness." The court reasoned that any perceived need by defendant to defend himself was based on a delusion that arose entirely from his mental illness, and therefore the trial court was right when it refused to instruct the jury on imperfect self-defense. Nevertheless, the Court of Appeal overturned defendant's first degree murder conviction because defendant was prejudiced by the trial court's failure to instruct the jury that evidence of hallucinations can negate premeditation, a requirement of first degree murder. Notwithstanding that reversal, defendant sought review in this court on the issue of whether imperfect self-defense can arise from a delusion caused by mental illness. This court granted review.

4

## II

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) A defendant who kills with the "deliberate intention unlawfully to take away the life of a fellow creature" (§ 188) acts with express malice; implied malice occurs when "no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart" (*ibid.*).

A person who kills in the belief that the killing is necessary to avert an imminent threat of death or great bodily injury lacks malice, an element of the crime of murder. If that belief is *reasonable*, the killing is justified and therefore not a crime. (§ 197, subd. (3).) But if that belief is *unreasonable*, the crime is voluntary manslaughter (an unlawful killing without malice) under the doctrine of imperfect self-defense. This court has observed: "*Imperfect self-defense* obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand." (*People v. Rios* (2000) 23 Cal.4th 450, 461; see *People v. Anderson* (2002) 28 Cal.4th 767, 782 (*Anderson*); *Christian S.*, *supra*, 7 Cal.4th at p. 783; *People v. Flannel* (1979) 25 Cal.3d 668, 672.) The unreasonable belief in the need for self-defense may stem from mental illness, negligence, subaverage intelligence, or a variety of other causes. To negate malice, it should not matter *why* the killer perceived a need for self-defense. *Any* genuine belief in the need for self-defense precludes a murder conviction, because such a belief " 'cannot coexist' " (*Rios*, *supra*, at p. 461) with the mental state of malice, an essential component of the crime of murder. It follows, therefore, that imperfect self-defense can arise from a delusion caused entirely by mental illness.

California's statutory criminal law expressly allows criminal defendants to introduce evidence of mental illness to show they lack the requisite mental state of

5

malice, a statutory element of murder. Pertinent here is section 28's subdivision (a), which states: "*Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually* formed a required specific intent, premeditated, deliberated, or *harbored malice aforethought*, when a specific intent crime is charged." (Italics added.) It follows from section 28's plain language that someone who kills in the belief that the killing is necessary to avert death or great bodily injury may introduce evidence that the unreasonable belief arose as the result of a delusion that was caused by mental illness.

Disregarding this statutory directive, the majority instead adopts the analysis of the Court of Appeal in *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437 (*Mejia-Lenares*). That court seized on this court's fleeting reference to the affirmative defense of mistake of fact contained in footnote three in *Christian S.*, *supra*, 7 Cal.4th at page 779. Echoing the Court of Appeal's explanation in *Mejia-Lenares*, the majority here concludes: (1) Imperfect self-defense "is 'a species of mistake of fact' " (maj. opn., *ante*, at p. 10, quoting *Mejia-Lenares*, *supra*, at p. 1453); (2) a killer whose unreasonable belief in the necessity of self-protection stems entirely from a delusion is not acting under a mistake of fact; and (3) therefore, the doctrine of imperfect self-defense can play no role in a killing caused entirely by the killer's delusional belief in the need for self-defense. (Maj. opn., *ante*, at pp. 10-11.) I disagree, for two reasons.

First, the majority is wrong, as was the Court of Appeal in *Mejia-Lenares*, *supra*, 135 Cal.App.4th 1437, in describing this court's 1994 decision in *Christian S.* as holding that imperfect self-defense is a "species of mistake of fact." (Maj. opn., *ante*, at p. 10; *Mejia-Lenares*, *supra*, 135 Cal.App.4th at p. 1453.) What *Christian S.* does hold is that the Legislature did not abrogate imperfect self-defense when, in 1981, it abolished the "diminished capacity" defense to murder.

As I noted in the preceeding paragraph, that decision's only mention of mistake of fact appears in a brief footnote. That footnote states in passing that the defendant in *Christian S.*, who claimed he killed in imperfect self-defense, asserted that "he acted under an unreasonable mistake of fact." (*Christian S.*, *supra*, 7 Cal.4th at p. 779, fn. 3.) The footnote then *distinguishes* the affirmative defense of "ignorance or mistake of fact" (§ 26, subd. (Three)) from imperfect self-defense. Thus, this court's decision in *Christian S.* does not hold that imperfect self-defense is a form of mistake of fact. Rather, that decision explains that imperfect self-defense is rooted in the notion that someone who kills in the belief that the killing is necessary to avert an imminent threat of death or great bodily injury does not have a "wrongful intent" (*Christian S.*, *supra*, at p. 778), and therefore lacks malice, an essential element of the crime of murder. (*Id.* at pp. 778-779; see *Anderson*, *supra*, 28 Cal.4th at p. 782.) This absence of malice, in my view, also pertains to a person whose genuine but unreasonable belief in the need for self-defense stems entirely from a delusion caused by a mental disorder. As a Court of Appeal decision explained, "A defendant's mental state is the same when he kills in the honest-but-mistaken belief that the victim was reaching for a gun whether such belief is the product of a delusion or a mistaken interpretation of the victim's reaching for his car keys." (*People v. Uriarte* (1990) 223 Cal.App.3d 192, 197.)

Second, even if mistake of fact *were* a critical part of imperfect self-defense, a person whose genuine belief in the need for self-defense is based entirely on a delusion does act under a mistake of fact. The person's mistaken belief that an attack is occurring or is about to occur is a mistake of fact, even if that belief is entirely delusional.

The majority perceives its holding — that a person who kills based on an entirely delusional belief in the need for self-protection is not acting in imperfect self-defense — as necessary so that questions pertaining to the sanity of a possibly

7

delusional defendant are resolved at the sanity phase, rather than the guilt phase. (Maj. opn., *ante*, at pp. 23-26.) But the majority's reasoning presents two problems. First, the majority's holding cannot be reconciled with the plain language of section 28's subdivision (a). (See p. 6, *ante*.) The majority essentially concedes this when it says that, in construing that section, it must look beyond "the letter of the law." (Maj. opn., *ante*, at p. 16.) Second, as explained below, the majority's holding does not accomplish its stated goal of relegating sanity issues to the sanity phase.

Because a killer's genuine belief in the need for self-defense negates malice (see p. 6, *ante*), under my approach the jury at the guilt phase need not decide whether that belief was delusional, but only decides whether that belief was genuine, and if so, whether it was reasonable. Under the majority's approach, by contrast, the jury at the guilt phase must decide whether the killer's belief in the need for self-defense was based at least partially on fact (in which case the defendant lacked malice and committed voluntary manslaughter) or based entirely on a delusion caused by mental illness (in which case the defendant acted with malice and committed murder). Notwithstanding the majority's claim that it is removing the question of the defendant's sanity from the guilt phase and confining it to the sanity phase, it is doing the opposite.

The majority limits its holding to a defendant whose belief in the need for self-defense is "entirely" or "purely" delusional. (Maj. opn., *ante*, at pp. 1, 26.) According to the majority, a belief is entirely or purely delusional if it is "divorced from the circumstances," meaning that there is an "absence of objective correlate." (*Id.* at p. 11.) Under the majority's definition, someone who "sees a snake where there is nothing snakelike" is delusional, but one who thinks a stick is a snake is not delusional, even if the mistaken belief persists in the face of irrefutable evidence. (*Ibid.*) Thus, it would appear that, under the majority's view, Don

8

Quixote was not delusional because each of his famous misperceptions, including his belief that windmills were " 'monstrous giants' " (Miguel de Cervantes, Don Quixote (Ormsby, trans.) pt. 1, ch. VIII, available at *http://www.online-literature.com/ Cervantes/don_quixote/* [as of June 2, 2014]) had, in the majority's words, an "objective correlate." Under the majority's decision, defendants may continue to present Don Quixote-style delusional beliefs to support claims of imperfect self-defense based on mistakes of fact. (Maj. opn., *ante*, at pp. 25-26.) The unenviable task of distinguishing such partly delusional beliefs having some objective basis from those that are "purely" or "entirely" delusional will be left to trial courts and juries.

## III

I now apply the relevant legal principles to the facts here.

Defendant testified that he was sitting at a bus stop when someone said "something violent" and "did something" to him; he then stabbed Suggs. For three reasons, this evidence is inadequate to support defendant's requested jury instruction on the imperfect self-defense theory of voluntary manslaughter.

First, as described in part II, *ante*, imperfect self-defense (a genuine but unreasonable belief in the need for self-defense) applies only when the killer unreasonably perceives an *imminent* threat of death or great bodily injury. (*Christian S.*, *supra*, 7 Cal.4th at p. 783.) Here, defendant did not testify, nor does the record before this court show, that he perceived an immediate risk of death or great bodily injury when he stabbed and killed Suggs.

Second, a killer acting in imperfect self-defense must unreasonably believe that the *victim* put the killer at risk of death or great bodily injury. (See *People v. Rios*, *supra*, 23 Cal.4th at p. 461 [imperfect self-defense applies when the defendant unreasonably believes "the lethal act was necessary to avoid . . . death or serious injury at the victim's hand"].) Here, the record contains no evidence that defendant believed victim Suggs had threatened him in any manner. Although

9

defendant testified at trial that "[*s*]*omebody* was saying something violent" (italics added) to him just before he killed Suggs, and he previously had told prosecution psychiatrist Sharma that *someone* had hit him with a crowbar before the stabbing, defendant did not say that the "somebody" or "someone" was Suggs.

Third, imperfect self-defense applies only when a defendant unreasonably believes that "deadly force is *necessary* in self-defense." (*People v. Manriquez* (2005) 37 Cal.4th 547, 583, italics added.) Here, defendant did not testify that he perceived a need to kill Suggs to protect himself; rather, he repeatedly asserted that he did not "intentionally" kill Suggs, claiming he acted "out of anger" after "something violent," not elaborated, was said or done to him.

"[A] trial court is not required to instruct the jury as to all lesser included offenses, only those that 'find substantial support in the evidence.' [Citation.] In this context, substantial evidence is evidence from which reasonable jurors could conclude ' "that the lesser offense, but not the greater, was committed." ' " (*People v. Medina* (2007) 41 Cal.4th 685, 700.) Here, as explained above, the record lacks substantial evidence from which a reasonable juror could have found defendant guilty not of murder but only of voluntary manslaughter, based on a theory of unreasonable self-defense. Thus, the trial court was right in denying defendant's request for a jury instruction on voluntary manslaughter based on a theory of imperfect self-defense.

KENNARD, J.*

WE CONCUR:

WERDEGAR, J.
LIU, J.

---

\*      Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Elmore

_____

**Unpublished Opinion** XXX NP opn. filed 10/27/10, 2d Dist., Div. 7
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S188238
**Date Filed:** June 2, 2014

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Arthur M. Lew

_____

**Counsel:**

Eric R. Larson, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lawrence M. Daniels, Paul M. Roadarmel, Jr., and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

Mitchell Keiter as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Eric R. Larson
330 J Street, #609
San Diego, CA 92101
(619) 238-5575

Rama R. Maline
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-2287