Filed 11/22/22  In re J.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | C094403 |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>J.R.,<br><br>        Defendant and Appellant. | (Super. Ct. No. JDSQ2000026) |

A juvenile court committed J.R. (the minor) to the Division of Juvenile Justice for 15 years after finding he committed second degree murder.  The minor now challenges the court's finding for two reasons.  First, he contends the juvenile court's finding that he committed second degree murder lacks evidentiary support.  Although he acknowledges he unlawfully shot a man to death, he asserts he lacked the malice necessary for second degree murder under the doctrine of imperfect self-defense—a doctrine that applies when a person kills based on an honest but unreasonable belief in the necessity to defend against imminent danger of death or great bodily injury.  Second, he contends the

1

juvenile court's ruling followed from a misunderstanding of the doctrine of imperfect self-defense and, in support, cites several instances where the court mischaracterized the doctrine.

We reject both arguments. While the juvenile court misstated the law at times in discussing imperfect self-defense, we are satisfied that it ultimately applied the correct standard. We are also satisfied that substantial evidence in the record supports the court's finding that the minor committed second degree murder. Apart from addressing the minor's arguments, we also address one sentencing issue. Although, the juvenile court found true an enhancement allegation that the minor personally used a firearm when he committed the murder, it neither extended the minor's commitment based on this enhancement nor struck the enhancement. We will remand to the juvenile court to clarify its decision. In all other respects, we affirm.

BACKGROUND

A district attorney filed a juvenile wardship petition under Welfare and Institutions Code section 602 after the minor shot to death a man named Lonnie L. The district attorney alleged in the petition that the minor committed murder and that he personally used a firearm, personally discharged a firearm, and personally discharged a firearm causing great bodily injury or death. The parties afterward stipulated that the minor shot Lonnie in the chest, which damaged his heart, lung, and liver and caused his death.

At the hearing on the petition, several witnesses offered conflicting accounts of the facts surrounding the shooting. Lonnie's wife, Erica L., offered the following account. She and Lonnie awoke to the sound of their son, J.L., screaming outside. They ran outside in their bathrobes and found "a whole bunch of kids, older kids in their teens," including J.L. and the minor. Erica described the scene this way: "Everybody kind of fighting everybody, kind of thing." She yelled, "Knock it off. Let's go inside. Knock it off." She also tried to get J.L. away from the fighting. After Erica, J.L., and Lonnie started to leave, the minor pointed a gun at J.L. J.L. responded, "sorry, sorry, man.

2

We're leaving." The minor then pointed the gun at Erica. But after Lonnie made a comment, the minor turned the gun on Lonnie. Lonnie then taunted the minor, saying, "Hey, you. Take that pellet gun, your little pellet gun, BB ass. Punk kids, get out of here and go home." He also called the minor stupid. Erica then heard a gunshot and heard Lonnie say, "Oh, no babe. He shot me. No. Oh, babe." The minor was about eight to 10 feet from Lonnie at the time. Erica never saw Lonnie holding a weapon nor saw him approach the minor.

J.L. testified similarly. After hearing a disturbance outside his house, J.L. ran outside and saw a boy yelling and punching his girlfriend's cousin's car. J.L. and another person outside, Ja. L., began fighting shortly after. Several other people outside joined the fight too. Lonnie and Erica came outside the house as the fighting went on. Lonnie encouraged J.L. to win the fight, and Erica screamed as she tried "to make sense of what [was] happening." At some point during the fighting, the minor pointed a gun at J.L.'s chest and told him he "was going to blow [his] fucking brains out." J.L. put his hands up, begged for forgiveness, and asked the minor to chill. Sometime later, the minor pointed his gun at Lonnie, who, at the time, was trying to get J.L., J.L.'s girlfriend, and Erica inside. Lonnie told the minor "[t]o go put that toy BB gun down and go to sleep." J.L. then heard a shot and heard Lonnie say, "Mom, he just shot me." The minor was about six feet from Lonnie at the time. J.L. never saw Lonnie with a weapon, never saw him make any threats, and never saw him fighting anyone that evening.

The minor offered a very different account of the shooting. He was staying at his girlfriend's house at the time. After hearing his girlfriend's brother was getting jumped, he ran outside and saw J.L. and Ja. L. fighting. The minor was friends with Ja. L. The minor ran back inside his girlfriend's house, grabbed his gun, and returned to the fighting. He grabbed the gun for protection and to break up the fight. The minor, who kept his gun hidden at the time, told J.L. to "let my friend get up." J.L. eventually complied. But shortly after, J.L. and Ja. L. began fighting again. A man in a robe

3

(Lonnie) came toward the minor around this time, acted aggressive, looked crazy, and appeared to be on drugs. Lonnie carried an object about 12 to 18 inches long that looked like a wooden post.

The minor twice told Lonnie to stop his approach and, when Lonnie failed to listen, the minor pulled out his gun and said, "This is what I have. Just go inside." Lonnie responded, "You punk kid. Put that BB gun away." He then continued his approach and added, "What are you going to do about it?" The minor warned him, "I'm not like these other people. I will really shoot you." He then cocked the gun and pointed it at the ground, but Lonnie only laughed at him, saying, "You punk kid. . . . Put that BB gun away." The minor began stepping back to maintain a four-foot gap between him and Lonnie, but Lonnie continued his approach.

After Lonnie "kind of" moved his arm, the minor fired the gun. He pointed the gun at Lonnie's chest and then aimed to the right before firing, intending to prove to Lonnie he had a real gun and to scare Lonnie without hitting him. The minor then "[c]asually" turned around and walked back to his girlfriend's house, thinking at first that he had missed Lonnie and later, after Lonnie said he had been shot, that he might have grazed him. Before firing the gun, the minor felt scared for his life, believed anything could have happened with Lonnie so close, and did not believe he could turn his back on Lonnie and run away. He also felt disrespected by Lonnie but more afraid than disrespected. The minor said he had no experience with guns at the time.

The minor's friend, Phillip Rutherford, described the events consistent with the minor. He saw J.L. and Ja. L. fighting and, at one point, J.L. tried to fight him too. After J.L. got on top of Ja. L. and started hitting his head into the ground, Rutherford tried to push J.L. off Ja. L. But as he tried to intervene, Lonnie hit him once or twice in the back with "a bar or a bat or something" and left him with a bruise. Lonnie then began hitting Ja. L. too and encouraged J.L. to "beat his ass." Lonnie also ran at other people with his weapon and swung it around, but he never hit anyone else. Rutherford said he was

4

"pretty intoxicated" at the time of the fighting. He drank "at least two bottles of Jack Daniels" before the fighting started, and about a quart of brandy afterward with his mother.

Lonnie and Erica's neighbor, Robert Lawrence, also testified about the night of the shooting. After hearing noises outside, he went outside and saw a fight in the middle of the street. Both J.L. and Lonnie were present and outnumbered. J.L. was fighting someone, and Lonnie was trying to pull someone off J.L. and break up the fight. Several kids hit Lonnie and Lonnie, in turn, hit back while trying to end the fight. According to Lawrence's initial testimony, he never saw Lonnie with a weapon, though he saw "something next to him" after he was shot. But after a three-day break in his testimony, he said Lonnie in fact did have a weapon, which was about 18 inches long. He also said Lonnie raised the weapon threateningly, though he never swung it. Lawrence stated he was heading back toward his home when he heard a gunshot. He then heard Lonnie say, "They shot me in the dick," and saw Lonnie grab that area.

During the questioning of several witnesses, the parties asked about a souvenir baseball bat found at the scene. Erica said she had never seen the bat before. J.L., on the other hand, said he had seen the bat. After the shooting, J.L. saw others run, heard a bat fall to the ground, and then saw a bat on the ground about 14 feet from Lonnie. The souvenir baseball bat was the bat he saw. J.L. added that he never saw anyone holding the bat and had never seen that bat in his house. Rutherford also recalled seeing a souvenir baseball bat, though in his telling, Lonnie used the bat as a weapon. He said Lonnie's weapon "looked like one of those little souvenir baseball bats you get at the baseball parks. It looked like one of those." But he then said he only made that determination at a later date; around the time of the shooting, he did not "know what it was." Lawrence did not recognize the bat, but he said the weapon he saw Lonnie carrying was about the size of the bat.

5

Following the above witnesses' testimony, several officers testified that each of these witnesses had offered a materially different account in their statements shortly following the shooting. Although, for instance, Lawrence testified he saw Lonnie hit someone during the fighting, he told an officer that Lonnie never hit anyone. And although Lawrence ultimately testified he saw Lonnie carrying a weapon during the fighting, he told officers otherwise in his initial statement: "He did not see a weapon in [Lonnie's] hands."

J.L.'s and Erica's testimony likewise occasionally strayed from their statements to officers. Although J.L. testified that the minor pointed a gun at him, he told officers he only heard the gunshot; he never actually saw the gun. And although Erica testified that the minor pointed the gun at her and J.L., she never mentioned that detail in her statement to officers. Nor, in her statement to officers, did she say she saw the minor point the gun at Lonnie or anyone else. Erica also informed the officers that she could not see exactly who was involved because she was not wearing her glasses.

The minor's and Rutherford's testimony also occasionally departed from their statements to officers. The minor, for instance, testified he had no experience with guns. But he earlier told officers differently: He had been shooting with his father a couple of times before Lonnie's death. He also testified he believed Lonnie was on drugs, likely methamphetamine. But he made no mention of this detail in his interview with the officers. He further said Lonnie was eight feet away at the time he fired the gun, not four feet away as he testified. Rutherford also described the facts somewhat differently in these two settings. Although he testified about being present during the shooting, he initially told an officer he knew nothing about the shooting. And after he acknowledged being present in a later interview with officers, he told the officers that Lonnie hit him with a weapon on the head—not, as he testified, that Lonnie hit him on the back.

The parties' remaining evidence largely concerned security camera footage, character evidence about Lonnie, and character evidence about the minor. A detective

6

reviewed surveillance videos taken from several home security systems, including from Lawrence's house and Erica and Lonnie's house. In viewing the video footage, the detective never saw Lonnie carrying a weapon. But the detective acknowledged he could not see Lonnie's left hand and part of his left arm.

The character evidence about Lonnie was both good and bad. The good character evidence came from a man who had dated Erica's sister for nine years. He said he had never witnessed Lonnie act violently toward anyone during the nine years he was with Erica's sister, never saw him use methamphetamine "or any of that type of stuff," and found him to be a "very kind, kind man." The bad character evidence came from a 2009 article that the parties stipulated should be admitted into evidence. One minor, who was 11 years old at the time, said Lonnie asked her to perform oral sex on him and, when she refused, Lonnie threatened to tie her up and throw her in the river if she told anyone. Another minor, who was then 15 years old, said Lonnie gave him valium and a morphine patch after he reported pain following yard work. Later the same day, Lonnie told the boy to sleep with him and his wife and, the morning after, hit the boy in the legs with a belt because he thought the boy disclosed what happened. A third minor, who was then around 16 years old, said Lonnie and Erica gave her hallucinogenic mushrooms and tried to have sex with her. After the minor refused, Lonnie and Erica had sex in front of her.

The character evidence about the minor concerned his good character. His mother testified that he is nonviolent, loving, honest, and helpful with family. Another witness, Jodi Hernandez, testified similarly. She met the minor when she was an assistant at an in-school suspension room. She first became familiar with the minor and his family after tutoring his sister at the minor's home, and she later saw the minor at the in-school suspension room after he stopped going to school. Over time, Hernandez became close to the minor and his family. She believed the minor was honest, was not an aggressive person, and was not violent.

7

After hearing the parties' evidence, the juvenile court found the minor committed second degree murder. Although the minor claimed self-defense and imperfect self-defense, the court found neither applicable. It reasoned, among other things, that the evidence showed the minor acted because Lonnie "ma[d]e a wise crack about you're just basically a punk kid" and "that's not a real gun," not "because of a fear." The court also found the minor "personally used a firearm within the meaning of Penal Code[1] [s]ection 12022.5[, subdivision ](b) as alleged in the enhancement," though the only statute cited for the alleged enhancements was section 12022.53.[2] The court committed the minor to the Division of Juvenile Justice for 15 years for the murder. It intentionally added no additional time for the firearm enhancement, but it never explicitly struck the enhancement or the punishment for the enhancement.

The minor timely appealed.

DISCUSSION

I

*Substantial Evidence*

The minor first contends the juvenile court's finding that he committed second degree murder lacks evidentiary support. He reasons that because the prosecution presented insufficient evidence to rebut his claim of imperfect self-defense, the juvenile court should have found he committed voluntary manslaughter, not second degree murder. We disagree.

" 'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder.' " (*People v. Chun* (2009) 45 Cal.4th

---

[1] Undesignated statutory references are to the Penal Code.

[2] The court's minute order, unlike its oral pronouncement, cites to section 12022.53, subdivision (d). The court later cited this same provision during the disposition hearing.

8

1172, 1181; see §§ 187, subd. (a), 189.) Voluntary manslaughter, in turn, is the unlawful killing of another without malice. (§ 192, subd. (b).) In one of its forms, voluntary manslaughter is called imperfect (or unreasonable) self-defense manslaughter. (*People v. Elmore* (2014) 59 Cal.4th 121, 134 ["Unreasonable self-defense is 'not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter' "].) Under this theory of voluntary manslaughter, a person kills another based on " 'an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury' " and lacks the malice necessary for first and second degree murder. (*Ibid.*)

In this case, we find sufficient evidence supports the juvenile court's finding that the minor committed second degree murder. In evaluating the minor's contention, we must " ' "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the [the minor committed the alleged act] beyond a reasonable doubt." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 632.) Our job is not to evaluate witness credibility, " 'for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Ibid.*) Nor is it our job to reweigh the evidence. We instead must resolve all conflicts in the evidence in favor of the judgment's findings, so long as these findings are based on substantial evidence and not speculation, supposition, or conjecture. (*Ibid.*; *People v. Davis* (2013) 57 Cal.4th 353, 360.)

Applying this deferential standard here, we find sufficient evidence supports the finding of second degree murder. After seeing a friend in a fight with J.L., the minor grabbed his gun from his girlfriend's house, went back outside, and then approached J.L. According to J.L., the minor pointed the gun at his chest and said he was "going to blow [his] fucking brains out." And according to Erica, the minor pointed the gun at J.L., then

9

at her, and finally at Lonnie. Both J.L. and Erica heard Lonnie taunt the minor about the gun, calling it a "BB gun" or a "pellet gun." Erica also heard Lonnie call the minor "stupid" and a "[p]unk kid[]." The minor acknowledged these comments left him "pissed" (though "not mad") and wanting to prove he had a real gun. He also acknowledged he told Lonnie, "I'm not like these other people. I will really shoot you."

Following Lonnie's taunting, J.L. and Erica heard a shot and heard Lonnie say, "He shot me" or "he just shot me." Before the shooting, neither J.L. nor Erica saw Lonnie carrying a weapon. Nor does any of the surveillance video footage show Lonnie carrying a weapon, though, again, the footage never shows Lonnie's left hand and part of his left arm. J.L., moreover, never heard Lonnie make any threats, and neither J.L. nor Erica ever saw Lonnie move toward the minor. Considering this record, we find the evidence sufficiently supports a finding that the minor shot Lonnie because he was "pissed" and wanted to prove he had a real gun, not because he feared for his safety. And that is what the juvenile court found. In the court's words, "That's not somebody who is acting because of a fear. . . . That's somebody who is responding to somebody who makes a wise crack about you're just basically a punk kid. And that's not a real gun."

Although other evidence in the record also supports a contrary finding that the minor acted because he feared Lonnie, the juvenile court acted within its discretion in declining to credit this evidence. Relevant to this topic, three witnesses testified that Lonnie had a weapon, described at various times as a bat, a bar, and a wooden post. Lawrence, for example, testified that he saw Lonnie carrying a weapon about 18 inches long. But his testimony varied on this topic. First, he testified that Lonnie carried no weapon. But then, three days later, he testified that Lonnie did carry a weapon. And later still, he testified that he spoke truthfully with an officer about what transpired shortly after the shooting; and at that time, he said he did not see any weapon in Lonnie's hands. Given Lawrence's conflicting statements, the juvenile court reasonably could

10

have decided to credit Lawrence's initial characterization of the facts in his statement to an officer—which in Lawrence's own telling, was the truth.

Two other witnesses also testified about seeing Lonnie carrying a weapon: Rutherford and the minor. But the juvenile court reasonably found both their statements not credible. Rutherford was the minor's friend, said he testified to help the minor, and acknowledged he was "pretty intoxicated" the night of the shooting, having had "at least two bottles of Jack Daniels" with a friend before the shooting and a quart of brandy after the shooting with his mother. He also gave conflicting statements about the details of the shooting. He initially told officers he knew nothing about the shooting. But later he told officers otherwise. He also told officers Lonnie hit him on the head with a weapon. But at the hearing, he said Lonnie hit him on the back. He further claimed at the hearing that the weapon "looked like one of those little souvenir baseball bats," apparently similar to the baseball bat found at the scene. But he then said that at the time of the shooting he did not actually know what the weapon looked like; he only later managed to determine that the weapon "looked like one of those little souvenir baseball bats." Considering Rutherford's motive to help the minor, his intoxication the night of the shooting, and his changing statements, the juvenile court reasonably could have doubted (and ultimately did doubt) his credibility.

The juvenile court also had grounds for doubting the minor's credibility. The minor, as covered already, gave conflicting statements about his experience with firearms. At the hearing, he said he had no experience using guns. But in his earlier interview with a detective, he acknowledged he had shot guns with his father before Lonnie's death. The minor's characterization of the night of the shooting also appeared questionable. He said Lonnie had a weapon, acted aggressively, appeared to be on drugs, and acted unafraid of the gun. He added that he could not turn his back on Lonnie because Lonnie was only four feet away and "anything could happen." But he then said that after he fired his gun to scare Lonnie, he casually turned his back on Lonnie and

11

started walking away—even though he initially thought he had missed Lonnie and even though he had just claimed he could not turn his back on Lonnie because Lonnie was so close and "anything could happen." Considering this testimony, the juvenile court reasonably expressed doubt about the minor's credibility. It said: "If there was an imminent [danger[3]] and [the minor] was not sure he hit him, he wouldn't just be turning around to walk away. And if he's only firing at him to scare him, one might think he would have immediately gone over to see if he was okay. This was all an accident. But he did not."

The minor nonetheless maintains that the juvenile court should have found in his favor. But in making his argument, he evinces a misunderstanding of the relevant standard on appeal. He argues: "[S]ubstantial evidence supported the verdict of voluntary manslaughter on the theory of an actual but unreasonable belief that [Lonnie] was about to assault [the minor] with the potential for killing him or inflicting great bodily injury upon him. Therefore, [the minor's] second-degree murder conviction (count found true) must be reversed and a finding that he committed a voluntary manslaughter imposed." But the question is not whether substantial evidence supports the minor's position; it is instead whether substantial evidence supports the juvenile court's decision. And for the reasons covered, we find it does.

---

[3] The court omitted the word danger in its statement. It said: "If there was an imminent and [the minor] was not sure he hit him." But shortly before this statement, the court discussed the requirements for self-defense, stating that the minor must have "reasonably believed that he was in imminent danger of being killed or suffering great bodily injury." Considering this context, we understand that the court meant to say "an imminent danger," not simply "an imminent."

II

*The Juvenile Court's Misstatements About Imperfect Self-Defense*

The minor also contends the juvenile court prejudicially misunderstood the standard for imperfect self-defense. He notes that the juvenile court wrongly characterized imperfect self-defense as follows: "Imperfect self-defense is where there's one who would use like an excessive force; where one might have a defense of self-defense and use excessive or inappropriate force." The minor adds that the juvenile court applied this flawed understanding of imperfect self-defense to the facts of this case when it stated: "[This is] not a situation where there might be some force that would be appropriate and somebody uses excessive force. So that is why I don't think it's imperfect self-defense." We reject his argument.

The juvenile court, it is true, misstated the applicable standard for imperfect self-defense in these instances. As covered above, under the theory of imperfect self-defense, the trier of fact considers whether the actor had " 'an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury' " (*People v. Elmore*, *supra*, 59 Cal.4th at p. 134)—not, as the juvenile court represented, whether the actor had some ground for acting in self-defense but used excessive force. Under the applicable standard, an actor may have no valid reason for acting in self-defense, yet still be entitled to invoke the doctrine of imperfect self-defense. But not so under the juvenile court's stated standard. Under the court's understanding, even if the actor had an actual but unreasonable belief in the necessity to defend against imminent danger of death or great bodily injury, that would not be enough unless the actor also had a legitimate reason for using at least some force in self-defense.

But although the juvenile court evinced a misunderstanding of the appropriate inquiry in these statements, it ultimately (and appropriately) based its decision on an evaluation of the minor's actual beliefs. After discussing the minor's conduct, it said the following about the minor in rejecting his claim of imperfect self-defense: "That's not

13

somebody who is acting because of a fear. . . . That's somebody who is responding to somebody who makes a wise crack about you're just basically a punk kid. And that's not a real gun." The court similarly, discounting the minor's claimed fear of Lonnie, said: "If there was an imminent [danger] and [the minor] was not sure he hit him, he wouldn't just be turning around to walk away." The minor's conduct, in other words, belied his claim that he feared Lonnie and feared imminent danger of death or great bodily injury.

These statements show the juvenile court ultimately rejected the minor's claim of imperfect self-defense on a valid ground—the evidence negated his claim that he acted because he feared imminent peril. In the end, then, "even though the court, in isolated instances, misstated the applicable standard," "[t]he record of the hearing as a whole persuades us . . . it nevertheless applied the proper concept." (*People v. Mayfield* (1993) 5 Cal.4th 142, 196.)

### III

#### *Sentence Enhancement*

Apart from addressing the minor's arguments, we also address one sentencing issue.

In its petition, the prosecution alleged three firearm enhancements. It alleged the minor personally used a firearm within the meaning of section 12022.53, subdivision (b), personally discharged a firearm within the meaning of section 12022.53, subdivision (c), and personally discharged a firearm causing great bodily injury or death within the meaning of section 12022.53, subdivision (d). The juvenile court purported to find one of the alleged enhancements true. It found the minor "personally used a firearm within the meaning of Penal Code [s]ection 12022.5[, subdivision ](b) as alleged in the enhancement," though, again, the prosecution alleged firearm enhancements within the meaning of a different code section—section 12022.53. The court afterward committed the minor to the Division of Juvenile Justice for 15 years and intentionally declined to

14

impose any additional time for the firearm enhancement. But the court never purported to strike either the enhancement or the additional punishment for the enhancement.

We will remand to the juvenile court to clarify the applicable statute for the firearm enhancement and to clarify whether it intended to impose or strike the enhancement. (See *People v. Hunt* (1977) 19 Cal.3d 888, 897 ["a use finding cannot be dismissed or struck sub silentio"]; see also §§ 1385, subds. (a)-(b) [court can strike an enhancement entirely or "instead strike the additional punishment for that enhancement"]; § 12022.53, subd. (h) ["court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section"]; *People v. Vizcarra* (2015) 236 Cal.App.4th 422, 432 ["a trial court's failure either (1) to pronounce sentence on a statutory sentence-enhancement allegation based upon a finding by the trier of fact or an admission by the defendant that the allegation is true, or (2) to exercise its discretion—to the extent imposition of the enhancement is discretionary—to either strike the enhancement allegation or impose the enhancement, results in an unauthorized sentence"].)

## DISPOSITION

The matter is remanded to the juvenile court to clarify the applicable statute for the firearm enhancement and to clarify whether it intended to impose or strike the enhancement. The judgment is otherwise affirmed.

_____/s/_____
BOULWARE EURIE, J.

We concur:

_____/s/_____
HULL, Acting P. J.

_____/s/_____
MAURO, J.

15