Filed 12/19/22  P. v. Castro CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY JAMES TORREZ CASTRO,<br><br>    Defendant and Appellant. | H047414<br>(Santa Clara County<br>Super. Ct. No. C1638368) |

Following a court trial, defendant Anthony James Torrez Castro was convicted of one count of second degree murder (Pen. Code, § 187, subd. (a))[1] after he bludgeoned his father, Anthony Ray Castro,[2] to death with a hammer and a mallet.  Castro was sentenced to an aggregate term of 16 years to life in state prison.

On appeal, Castro argues that the trial court applied an incorrect standard with respect to imperfect self-defense and thus his conviction must be reversed.  As detailed below, we disagree and will affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Procedure

Castro was charged by information with one count of murder (§ 187, subd. (a)) and it was alleged that he personally used a deadly and dangerous weapon in committing that offense (§ 12022, subd. (b)(1)).

---

[1] Unspecified statutory references are to the Penal Code.

[2] Due to the similarity of names, we will refer to Anthony Ray Castro as "father" or "victim."

Castro waived his right to a jury trial. Following his bench trial, the court stated it did not find any facts to support a theory of self-defense or imperfect self-defense. The trial court acquitted Castro of first-degree murder but found him guilty of second-degree murder. The court also found true the allegation that Castro personally used a weapon in committing the murder. At sentencing, the trial court imposed an indeterminate term of 15 years to life on the second degree murder conviction with a consecutive one year term on the personal use enhancement.

Castro timely appealed.

### B. Evidence presented at trial

#### 1. Prosecution case

##### a. Marissa Castro

Marissa, Castro's half-sister,[3] testified about family history as well as what she observed after her father's murder.

Marissa is older than Castro and their parents separated when Marissa and Castro were toddlers. They lived in the same household[4] until Castro started high school, at which time he went to live with their mother while Marissa remained with father.

Marissa said that both her mother and father were not great at parenting when she and Castro were young. Father would yell at Castro and would hit him hard enough to leave marks. In 2010 or 2011, Marissa saw Castro and father arguing and father "like slammed [Castro] against . . . a wall." Father was around five foot nine inches tall and weighed between 215 and 230 pounds.

---

[3] Marissa and Castro have the same mother. The victim was not Marissa's biological father, but he signed her birth certificate and promised to raise her.

[4] Marissa testified that throughout elementary school, she and Castro would "go back and forth between" their mother's home and their father's home.

Marissa said that Castro was very social when he was younger, but after he went to live with their mother, Castro became a "different person." When Castro was around 18, he moved back in with Marissa and their father.

At this time, Marissa noticed Castro had few friends and his personal hygiene diminished. His clothing was not always clean and Marissa could smell his body odor. Castro's room "started to get really dirty as well." At some point, he was spitting on the walls and peeing in jars.

Castro became fixated on his pets, especially after his dog was run over by a car and killed. He began to communicate with grunts and gestures rather than speaking. Castro would lock himself in the bathroom or his room. He got other pets, like lizards and snakes, and when one of his snakes died, Marissa thought Castro might have slept with the dead snake in his bed. Castro was hospitalized and afterwards, there was some improvement in his behavior but "it fluctuated a lot."

During this time, father acted as Castro's caretaker. Father became less social as well, and if he went out to visit friends, he would take Castro with him. Father and Castro usually got along during this time.

In January 2016, Marissa, father, Castro, and another sister, T.C., moved into a two-bedroom home in San Jose. Marissa and T.C. shared one bedroom while father and Castro slept in the other. Father and Castro each had their own bed, and there was a retractable divider they could use for privacy.

Because Castro was not working or going to school, that caused tension between him and father. Marissa said their relationship was "off and on. They were either very buddy-buddy, and I would see them joking around or going to the store, or I'd get a call from my dad saying they had gotten in a fight and he was upset at [Castro]. Or I'd gotten another call saying that he had to like pin [Castro] to the ground." Marissa believed father was frustrated and did not know what was best for Castro, whether it was "being

3

very supportive . . . or if . . . [Castro] needed tough love." In spite of their conflicts, father and Castro always made up.

In May 2016, Marissa was not home often as she was working full-time, attending school in San Francisco, and in a relationship. She usually spoke to father multiple times a day though.

On Wednesday, May 18, 2016, Marissa realized that she had not been in contact with father for a few days. Marissa spoke to T.C., but she had not heard from their father either. The next day, Friday, Marissa returned to the house and saw father's car parked at an angle, which was unusual. Marissa went to move the car but saw a large bin was in the way. When she shifted the bin, she noticed it was very heavy and the lid of the bin was taped shut. Marissa removed the tape, and discovered father's body inside.

### b. The investigation

San Jose Police Officer Patrick Kirby responded to Marissa's 911 call. Near the recycling bin, Kirby found an empty container of disinfecting wipes and an empty cardboard spool from a roll of paper towels. Kirby also discovered a plastic wastebasket nearby which contained gray sweatpants, and several blood-stained paper towels. Inside the residence, Kirby found several blood stains in the kitchen.

San Jose Homicide Detective Wayne Smith interviewed Marissa at the scene. Marissa believed Castro was responsible for her father's death, but did not know where Castro was. On Sunday evening, May 22, Marissa called Smith and told him that Castro was at a hospital in Fremont.[5] Smith arrested Castro at the hospital.

After being advised of his *Miranda*[6] rights, Castro agreed to talk to police and denied killing his father. The initial interview was terminated when Castro asked for an

---

[5] Smith subsequently learned that the hospital in Fremont was a psychiatric hospital.

[6] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

attorney. The next day, however, Smith got a call informing him that Castro wanted to talk. Smith, another detective, and an investigator went to the jail for a second interview.

Smith again read him his *Miranda* rights before asking questions. At the outset of the interview, Castro again denied killing his father. He eventually admitted that his father confronted him about cleaning the house and hanging out at the park that night. His father started yelling. Castro went to the park, but his father followed him in his car. When Castro returned to the house, his father threatened to kick him out and Castro got scared.

Castro tried to talk to his father, but his father responded angrily. Castro got more frightened due to father's past physical abuse. As recently as this year, his father had punched him in the face. Because he was scared of being hit, Castro admitted that he may have hit his father with a hammer that he got from a kitchen cabinet.[7] His father was sitting down when Castro hit him in the back of the head with the hammer. His father fell over and told Castro not to hit him, but Castro hit him again in the back of the head. Castro then hit him a third time in the same place and his father "might've passed away at that time."

Castro tried to clean the blood off the floor and put his father's body in the bin outside. He taped the lid on the bin "[s]o no one would open it up."

### 2. Defense case

#### a. Castro's testimony

Castro testified on his own behalf at trial. He said his earliest memories were he and Marissa living with their mother in San Jose until the end of fourth grade. His mother was physically aggressive and would discipline him by hitting him with an open hand.

---

[7] Police retrieved a claw hammer and a mallet from a kitchen cabinet at the mobile home.

Castro and Marissa began living with father in fifth grade, and Castro remained there until the end of his freshman year of high school.  According to Castro, father was generous and hard working, but sometimes disciplined him in strange ways.  Castro described times that he was "locked in dog cages and . . . hit with random household items."  He emphasized that these were isolated incidents.

In junior high, however, father began getting physically aggressive, yelling at him, hitting him with an open or closed hand, or a belt.  He would get marks on his body when father hit him with his fist.  Castro did not fight back because father was so much bigger than him.

Castro moved back in with his mother to escape father's abuse only to have mother discipline him by punching him and hitting him with "household items, as well as gardening tools."  Castro has a scar under his eye from mother deliberately hitting him in the face with a glass candle holder.  Mother also frequently "kicked [him] out of the house."

The day after he turned 18, Castro "begged [his] father" to let him move back in with him.  After Castro moved in with father and Marissa, his father seemed to be upset with the living arrangements, yelling at Castro and occasionally getting into physical altercations with him.  Most of the time, Castro would simply leave rather than get into a fight, but if Castro tried to fight back, he "was no match" and father would pin him to the ground, ending the fight.

On one occasion, when Castro was 19, father came out of the apartment with a baseball bat and swung it at Castro from a few feet away trying to scare Castro into leaving.  Castro left with his dog, and began living on the streets.  After his dog was hit by a car, Marissa convinced Castro to return home.

Father, Marissa, and Castro subsequently moved to a trailer park.  Castro shared a room with father, while Marissa and T.C. shared the other bedroom.  Castro testified that, at the trailer park, he felt his life was going well.  He was going to adult education,

6

exercising some, and "being clean." Other than "the occasional spats, every day was a good day" with his father. Castro did not have an income, and his father paid for "a lot of things." Whenever Castro talked about wanting to move out, however, his father made fun of the idea.

Castro admitted urinating in jars, but explained it was due to laziness in not wanting to go into the bathroom. He also acknowledged he spat on the wall, but only because of an unusual cough.

Castro noticed that his father was under stress, from work and financial obligations, as well as struggling with his health and weight. During that period, they only had one argument, when Castro coughed up something on the wall. Castro said that his father got furious and threatened to cut off the power, which would be harmful to Castro's pets.

Possibly two weeks prior to his arrest, Castro was in the kitchen with his father, who was preparing lunch, and Castro said he wanted to get a job and move out. His father called him names, insulting his intelligence, so Castro went into his bedroom. Castro saw that his father was following him, still carrying the knife he had been using in the kitchen. His father did not hold the knife in a stabbing position and when Castro closed the bedroom door, that was the end of the incident.

For about a week before the killing, Castro's father was coming home from work upset, slamming cabinets and dishes as he prepared dinner. Castro would go outside to avoid a confrontation with father.

The morning of the killing, Castro got up and said goodbye when his father left for work. Castro started doing some "spring cleaning," and took a nap in the afternoon.

When his father arrived home around 8:00 p.m., he yelled at Castro to get up and clear up some cords Castro had left on the floor leading to the bedroom. Castro could hear his father slamming the cabinets in the kitchen, so he left the mobile home to "give [his father] his space." Castro fell asleep at a nearby park for a couple of hours.

7

When Castro started walking back to his house, his father drove up to him and angrily ordered him to go home.

At the mobile home, Castro walked out to the back patio to avoid a confrontation. Castro went out the front gate, intending to leave again, but his father told him that if he left, Castro would not be allowed back in the house. When Castro walked toward the front door, his father slammed it closed. Castro ran to the back and entered the sliding door into the bedroom. Within a few seconds, his father yelled at him to come to the kitchen.

When Castro got to the kitchen, he saw his father sitting at the table, his back to the cabinets. His father was angry, falsely claiming that he had to clean the house by himself when he got home from work. Castro did not say anything in response.

Several times, Castro started to back away toward the bedroom, but his father would stand up and yell at him to return. When Castro obeyed, his father would sit down again. His father called Castro "an embarrassment." Eventually, his father said that "he was going to put his hands on" Castro.

Castro was scared of his father, who was "a big guy and . . . very strong." Castro was afraid of being hurt again, so he walked behind his father, retrieved a hammer from one of the cabinets and hit his father in the back of the head.[8] His father stood up partway, started to turn towards him, screaming, "Ant, no." Castro hit him in the head again. When his father fell to the floor, Castro grabbed a larger hammer from the cabinet and hit him in the head a third time. His father "made a horrible gurgling noise" and Castro "assume[d] he died shortly after."

---

[8] Castro subsequently testified that, even though he was closer to the front door than his father, he never believed fleeing was a viable option. When pressed on why he chose to get a hammer and hit his father rather than go out the front door, Castro said, "Legally I have the right to stand my ground."

When asked why he hit his father a third time, Castro said he "didn't know how the initial strike was gonna play out, whether he was gonna get back up. . . . I hit him the third time as precautionary." [*Sic*.] On cross-examination, Castro testified he believed his life was in danger after the second blow. He also testified repeatedly that he loved his father and did not want him to die.

After the third blow, Castro was shaking and scared. He looked at the clock and saw that his sister T.C. could be home any minute. However, T.C. had just sent father a text asking if she could stay at her friend's house, so Castro took father's phone and replied " 'yes.' " During this time, his father was on the kitchen floor bleeding from his skull.

After 30 minutes or an hour, Castro went back to the kitchen to try to clean up. He never checked at any point to see if his father was still alive. Castro went outside and wheeled the recycling bin into the house. Castro cleaned up the blood with towels and a pair of gray sweatpants he had been wearing, and also used "some napkins or wipes" from below the sink. He put his father's body into the recycling bin, cleaning up the blood spatter and taping up the bin so no one would open it. Castro wheeled the bin back onto the patio.

Castro then walked barefoot for several miles to a restaurant. When he was taken to Kaiser Hospital for injuries to his feet, Castro told them he was "a danger to [him]self or others," at which point he was taken to the psychiatric hospital in Fremont where he was subsequently arrested.

In response to the court's questioning, Castro explained he retrieved a hammer because he was afraid of his father and needed to protect himself. After "years of abuse," Castro knew that his father would become violent with him. He confirmed that his father remained seated, with his hands underneath the table, as Castro walked to the cabinet. To Castro's knowledge, his father never carried any sort of weapon.

9

Castro's father did not say anything or move in any way as Castro opened the cabinet. Because his father had just threatened him, Castro wanted to hit him with the hammer to defend himself. Castro said that when he "grabbed the hammer[,] [he] was safe." After the second blow, Castro dropped the claw hammer and retrieved the mallet from the cabinet because it was "larger . . . and maybe he wouldn't be standing again." By hitting his father the first time, Castro thought he "could have hurt him, [but] not the way that he hurt me." When he struck him the second and third times, Castro did not think that he could hurt or kill his father. Once he put his father inside the recycling bin, Castro finally felt safe.

### b. Dr. Brad Novak

Dr. Brad Novak, a psychiatrist, testified as an expert on the effects of physical and emotional abuse on victims of family violence.

In preparing his report and testifying at trial, Dr. Novak reviewed Castro's mental health and medical records, his juvenile records, and jail records, as well as legal reports related to the case. He also met with Castro on three occasions, for a total of about seven hours.

Castro told Dr. Novak about both parents' neglect and physical abuse. Dr. Novak referenced the two incidents in which Castro's father threatened Castro with a weapon, specifically swinging a baseball bat at him and following him with a knife.

In reviewing Castro's records relating to drug use, Dr. Novak believed Castro met the criteria for moderate marijuana use disorder but that was not a "significant factor in the killing of his father." Dr. Novak did not believe Castro met the criteria for other mental conditions, though there was some evidence to support schizophrenia, post-traumatic stress disorder, major depressive disorder, borderline personality disorder, and antisocial personality disorder. Castro had a history of malingering[9] and Dr. Novak

_____

[9] Dr. Novak testified that, during his evaluation of Castro, Castro was not malingering.

was concerned that Castro was "trying to make himself look for [*sic*] stable, more high functioning than he really is."

Dr. Novak opined that Castro's history of childhood abuse had a significant impact on his behavior, and caused him to be emotionally stunted. Castro felt controlled by his father, both afraid of him and afraid to leave him.

Dr. Novak testified that a victim of trauma can develop a hypersensitive "fight or flight" response. However, in some people, the "fight or flight" response causes a "deer in the headlights" response. In this case, where Castro described himself as afraid "but calm" when he killed his father, Castro was emotionally detached, which Dr. Novak described as "a form of freezing."

Dr. Novak testified he did not have enough evidence to conclude that Castro had dissociated during the killing, but rather that he was "detached" from his emotions. Trauma victims, like Castro, "have a lot of repressed anger that they detach from."

Dr. Novak also discussed the concept of learned helplessness, in which trauma victims learn through repeated experience that nothing they do can end the abuse. In this case, Castro was exhibiting learned helplessness when he did not move out.

According to Dr. Novak, trauma victims often have conflicting feelings about those who abuse them, with negative feelings more in their unconscious. When a victim has "a lot of repressed pent up emotions over a long period of time that are not being processed . . . [or] released[,] . . . they come out in an explosion all at once."

A history of abuse also can cause the victim to be hypersensitive to perceived threats, especially in the presence of the abuser. This hypervigilance can cause a trauma victim to overestimate the level of danger. Dr. Novak opined that Castro demonstrated hypervigilance by leaving the house when his father came home upset. On the night he killed his father, Castro was afraid his father would hurt him and, after striking him the first time, he was fearful his father could get back up again. Dr. Novak said that Castro

11

hit his father three times because "he didn't want his father to get back up again, and made sure that he didn't."

By putting the body into a recycling bin and not calling 911 as his father lay on the kitchen floor, Dr. Novak said that Castro's actions did not have as "much [to] do with trauma at that point as compared to someone who is trying to not be caught for what they just did." However, Dr. Novak also testified that this behavior is not inconsistent with how a trauma victim might act.

After the defense rested, the parties submitted closing briefs in lieu of oral argument.

### 3. Verdict

Before rendering its verdict, the trial court informed the parties that it "focused heavily on the jury instructions" and described the crime as "brutal," "violent," and "unnecessary." The court rejected voluntary manslaughter "based on the evidence and facts presented" and it "could not find provocation" under the law. Specifically, the court acknowledged that Castro and his father "had a long and difficult relationship[,] . . . sometimes characterized by violence," and that they "had an argument before the crime occurred." The court also found Castro "credible when he testified that there was an element of fear."

However, the court then noted that it questioned Castro "careful[ly] . . . to determine what exactly happened, and who was doing what." According to the court, Castro's father stood up "during the discussion in the kitchen," but "[t]here was a table that separated" the two men. "In the past . . . Castro had removed himself from the situation [when he and his father argued]." Having in mind Dr. Novak's testimony explaining "why sometimes that decision [i.e., to remove oneself from the conflict] is made in these situations with someone who has suffered trauma, and sometimes not," the court could not find that Castro's "father did anything that evening to provoke" Castro.

12

The court then stated it did not find "any facts which supported self-defense, imperfect self-defense." Specifically, the victim's "hands were folded under the table at the time that . . . Castro approached the cabinet" and the victim "was not saying anything."

The court indicated that the "more difficult decision and analysis" was whether the offense qualified as first-degree murder. Second-degree murder "was not a stretch . . . at all." Castro "committed an intentional act three times. He chose to pick up a hammer. He his hit [*sic*] father in the head with the hammer. He hit him again with the hammer. And then he made a decision to switch weapons and hit his father in the head with the mallet, while his father laid [*sic*] on the ground." This final sequence of events, i.e., switching to a larger weapon and striking the victim a third time as he lay on the kitchen floor, was what "caused the Court to strongly consider first-degree murder."

Ultimately, the trial court concluded the evidence of first-degree murder was not sufficient to "sustain its finding . . . beyond a reasonable doubt."

The trial court stated that it found beyond a reasonable doubt that defendant committed second degree murder. The court found it significant that the father said, "Ant, no" after the first hit and defendant continued his actions. The court then announced it found defendant guilty of second degree murder. It concluded by stating, "The Court has done its best to explain the factual findings it made in its analysis with respect to the evidence."

## II.    DISCUSSION

Castro argues that the trial court applied an incorrect legal standard in evaluating imperfect self-defense and that his conviction must be reversed. In his view, the trial court's statements indicate that it evaluated whether Castro's belief in the need to defend himself was reasonable, which is the standard for perfect self-defense. In opposition, the People claim that Castro has not cited any unambiguous misstatement of the law by the trial court and that the trial court's findings were that Castro did not himself believe he

13

needed to defend himself.  The People argue that Castro is essentially challenging the sufficiency of the evidence in support of the verdict.[10]

We agree with the People that the record does not establish that the trial court erred in its understanding of the doctrine of imperfect self-defense and in its application of the facts to that standard.

### A. Murder and imperfect self-defense

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133 (*Elmore*).)

Without malice, the unlawful killing of a human being is manslaughter.  (§ 192.) Where the evidence shows that a defendant intentionally killed "based on an honest belief in the need for self-defense, but this belief [was] not objectively reasonable, the defendant act[ed] in 'imperfect' or 'unreasonable' self-defense.  This state of mind negates malice, reducing the offense to voluntary manslaughter.  'It is the honest belief of imminent peril that negates malice in a case of complete self-defense; the reasonableness of the belief simply goes to the justification for the killing.' " (*People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1405.)  "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S*. (1994) 7 Cal.4th 768,

---

[10] Castro does not argue sufficiency of the evidence in his opening brief, and in his reply, states that "substantial evidence is not the issue here" and that "[the People's] entire substantial-evidence argument is beside the point."  As Castro is expressly disclaiming a sufficiency of the evidence argument, we will not address it further.

771.) "[U]nreasonable [or imperfect] self-defense 'is based on a defendant's assertion that he lacked malice . . . because he acted under an unreasonable *mistake of fact—*that is, the need to defend himself against imminent peril of death or great bodily harm.' " (*Elmore*, *supra*, 59 Cal.4th at p. 136.)

### B. *No misstatement of the law*

As a general rule, an appellant may not rely on a trial court's remarks in a bench trial to demonstrate that the trial court's reasoning was erroneous or that it misapplied the law. (*People v. Dawson* (2021) 69 Cal.App.5th 583, 592 (*Dawson*).) This rule is " 'founded on the principle that, in a criminal bench trial, the trial court is not required to provide a statement of decision and that any explanation of his or her decision a trial judge provides is not part of the record on appeal.' " (*Ibid.*) However, this rule is subject to an exception: " '[W]e may nonetheless consider a judge's statement when, *taken as a whole*, the judge's statement discloses an incorrect rather than a correct concept of the relevant law, "embodied not merely in 'secondary remarks' but in [the judge's] basic ruling." [Citations.]' [Citation.] This limitation on the general rule applies only where 'the court's comments *unambiguously* disclose that its basic ruling embodied or was based on a misunderstanding of the relevant law.' " (*Ibid.*)

In this case, the trial court's remarks do not unambiguously show that it misunderstood the law of imperfect self–defense. To constitute an unambiguous misstatement of the law, the court would have had to state, for example, that imperfect self-defense could only apply if Castro's belief were reasonable or that his actual belief was irrelevant. The trial court did neither.

"The general rule is that a trial court is presumed to have been aware of and followed the applicable law." (*People v. Mosley* (1997) 53 Cal.App.4th 489, 496.) Although the applicable jury instructions are not part of the record on appeal, the trial

court expressly noted that it "focused heavily on the instructions [it] would normally give to a jury" and even "reread [them]."[11]

Castro seizes on the trial court's finding that he was "credible when he testified that there was an element of fear." In his view, because the court did not qualify this statement in any way, the court was saying it found credible the entirety of his testimony, most importantly his belief that his life was in imminent danger and it was necessary for him to use deadly force to defend himself. Castro overstates his case. The plain meaning of the court's statement was that it credited Castro's testimony specifically on the "element of fear" and, based on the history of physical violence in their relationship,[12] that fear was justified. The court did not say it found credible Castro's belief that he was "in imminent danger of being killed or suffering great bodily injury" and "the immediate use of deadly force was necessary to defend against the danger." (CALCRIM No. 571.)

Castro also highlights the trial court's findings that, when Castro walked toward the cabinet to retrieve a hammer, his father's hands were underneath the table and that his father was not speaking (and impliedly not yelling at him). He contends that these statements reflect the trial court's misunderstanding of imperfect self-defense as requiring that his actions in that moment be reasonable under the circumstances. This misapprehends the import of the court's statements. By describing the father's posture and demeanor, the court was expressing its conclusion that Castro did not *actually*

---

[11] CALCRIM No. 571 addresses imperfect self-defense and provides in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because (he/she) acted in (imperfect self-defense . . .). [¶] . . . [¶] The defendant acted in (imperfect self-defense . . .) if: [¶] 1. The defendant actually believed that (he/she . . .) was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

[12] The trial court also acknowledged that Castro "had a long and difficult relationship" with his father that was "sometimes characterized by violence."

believe he was in imminent danger of being killed or seriously injured or that he needed to immediately use deadly force to defend himself.

Even largely crediting Castro's testimony, the trial evidence does not support a conclusion that Castro actually believed he was in danger of being killed or seriously injured that night. In the past, Castro's father sometimes hit him with a closed fist, leaving a mark. He would sometimes pin Castro to the ground, but would let him up once Castro submitted. On one occasion, he swung a baseball bat at Castro but, as Castro testified, he was not hit with the bat and his father swung it at him to "scare" him away. On another occasion, Castro got into an argument with his father in the kitchen while his father was preparing his lunch. As Castro walked back to his room, he saw his father following him, still holding the knife he had been using, but Castro said his father never raised the knife at him or hold it in a threatening manner. We recount these episodes not to diminish their serious nature. Physical abuse of anyone can never be justified. Rather, we describe the testimony to evaluate, as the trial court did when it acknowledged the violent nature of Castro's relationship with his father, whether Castro *actually* believed he was in imminent danger of *death or serious injury* that night or that he needed to use deadly force to protect himself.

In any event, the statements do not show the trial court unambiguously misapprehended the law of imperfect self-defense. Therefore, Castro cannot show the trial court's reasoning was erroneous or that it misapplied the law of imperfect self-defense. (*Dawson*, *supra*, 69 Cal.App.5th at p. 592.)

### III. DISPOSITION

The judgment is affirmed.

17

_____
                       Wilson, J.


WE CONCUR:




_____
        Danner, Acting P.J.




_____
             Lie, J.




People v. Torrez Castro
H047414