Filed 1/17/24  P. v. Schuller CA3
Opinion on remand from Supreme Court

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE, | C087191 |
| Plaintiff and Respondent, | (Super. Ct. No.  F16000111) |
| v. | OPINION ON REMAND |
| JASON CARL SCHULLER, | |
| Defendant and Appellant. | |

During his murder trial, defendant Jason Carl Schuller requested the trial court instruct the jury on voluntary manslaughter based on imperfect self-defense.  The trial court denied the request.  Following a plea of not guilty by reason of insanity, a jury found Schuller guilty of first degree murder in the guilt phase.  He was ultimately found legally sane and sentenced to an aggregate term of 50 years to life.  Schuller appealed, arguing substantial evidence demonstrated he had an actual, albeit unreasonable, belief in

1

the need for self-defense that was not entirely delusional. In our original published decision in this matter, we agreed the trial court erred in denying Schuller's request for an imperfect self-defense instruction; but, we concluded the error was harmless based on the overwhelming evidence Schuller had not acted out of any form of self-defense, and affirmed the judgment. (*People v. Schuller* (2021) 72 Cal.App.5th 221, 243 (*Schuller I*), revd. with directions (2023) 15 Cal.5th 237.)

After this court filed its opinion in November of 2021, Schuller sought, and our Supreme Court granted, review. Our Supreme Court held the standard for evaluating prejudice for this form of instructional error is harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) and concluded our prejudice analysis did not comport with *Chapman*. (*People v. Schuller* (2023) 15 Cal.5th 237, 260, 261-263 (*Schuller II*).) Our Supreme Court specifically found that our prejudice analysis suggested this court improperly weighed the evidence. (*Id*. at pp. 261-263.) The Supreme Court also explained that once an appellate court concludes sufficient evidence exists to compel an instruction on imperfect self-defense, the appellate court cannot also find the error harmless under *Chapman* solely because "the evidence against imperfect self-defense was so overwhelming that no reasonable jury could have possibly found in [defendant's] favor." (*Id.* at p. 263.) Accordingly, our Supreme Court reversed the judgment and remanded the matter to us with directions to reconsider whether the failure to instruct on imperfect self-defense was harmless beyond a reasonable doubt. (*Id.* at pp. 263-264.) We have received and considered supplemental briefing from the parties, and consistent with the Supreme Court's decision, we now conclude the error was not harmless beyond a reasonable doubt. Therefore, we will reverse and remand the matter for further proceedings.

# I. BACKGROUND

We draw our summary of the facts from the Supreme Court's opinion in *Schuller II, supra*, 15 Cal.5th at pp. 244-251 and our opinion in *Schuller I, supra*, 72 Cal.App.5th at pp. 225-230.

The Nevada County District Attorney charged defendant Jason Schuller with the first degree murder of W.T. and further alleged that Schuller had personally used and discharged a firearm causing death. (Pen. Code, §§ 187, 12022.53.)[1]  Schuller pled not guilty by reason of insanity and the case proceeded to trial.

## A.  Trial Court Proceedings

### 1.  Evidence at Trial

#### a.  Prosecution's Case-in-Chief

Jesse, W.T.'s neighbor and close friend, testified that Schuller visited W.T. frequently and had temporarily lived at his residence.  In early 2016, however, W.T. told Jesse that Schuller was no longer welcome at his home.  On the night of March 20, 2016, Jesse returned from a dinner and was surprised to see Schuller's vehicle, a white Chrysler 300, parked outside of W.T.'s home.  Shortly after Jesse entered his house, he heard multiple rounds of gunshots and then saw Schuller's car speed away from W.T.'s home.

As Jesse approached W.T.'s residence he saw W.T.'s daughter, H.T., who lived in a second-floor unit directly above W.T., pacing in front of the window.  Jesse knocked on H.T.'s door and asked her if she had heard gunshots.  She said she was uncertain what she had heard, but that a noise had caused her apartment to rattle.  Jesse then went downstairs to check on W.T.  When he entered the residence, he saw "flames coming out of [the] house" and W.T.'s burning body lying on the floor.  Jesse ran back to his house to retrieve a fire extinguisher.  When he returned, H.T. had come down to her father's

---

[1]  All further undesignated statutory citations are to the Penal Code.

3

apartment. As Jesse tried to put out the fire, he noticed that all four burners of the gas stove had been opened and "turned on full bore without flames," like someone was trying to "blow the place up." Jesse called 911 and provided a description of Schuller's car.

H.T. testified that Schuller had become friends with her father and started staying on his couch from time to time. On the night of March 20, 2016, she observed Schuller's car parked outside her father's apartment. Shortly thereafter, she heard a succession of sounds like metal hitting metal coming from the residence and then "a very loud sound that physically shook the house." She then observed Schuller's vehicle leaving the home at a high rate of speed. When H.T. entered the apartment, she observed smoke and her father's body lying on the ground surrounded by shell casings, with his dentures out of his mouth.

Shortly after Schuller was seen leaving W.T.'s residence, police began pursuing a white Chrysler 300 in the area. Schuller was driving the vehicle and refused to stop, resulting in a 38-mile high-speed pursuit that ended only after the vehicle's tires were punctured with strip spikes. The handgun used in the shooting of W.T. was found in the car.

Investigating officers testified that 13 shell casings were recovered from the area near W.T.'s body. A gun case, a gas can, and a large knife were found on the kitchen table. Although there was significant blood spatter on the walls and floor, there was no blood on the knife. W.T.'s cell phone was found under the table with a bullet lodged in it. The apartment had sustained fire damage and smelled of gas. Nevada County Fire District Chief Jim Turner determined that gasoline had been poured on the body and ignited. An autopsy revealed W.T. had sustained nine gunshot wounds to the left side of his head, with five shots entering the "facial area" and four shots entering above his ear in the "cranial area." W.T.'s body also exhibited significant burn injuries. According to the pathologist, the nature of the burn markings indicated W.T.'s body had been ignited after he was dead.

4

> b. *The Defense's Case*

Schuller testified that he met W.T. after moving from Nebraska to California in 2013. Over the next few years, Schuller lived with W.T. from time to time and visited him often.

In 2016, Schuller was injured in a car accident and began experiencing visions of his dead ancestors and a "beautiful light." He described the light as "a gift of god" and had heard voices telling him to be "careful who [he] share[d] the light with." Schuller stated that he believed he was sent to "pave the way for the second coming . . . of Christ," and that a battle was being fought with "Satan's army." In March of 2016, Schuller drove to Nebraska in response to voices directing him to perform an operation there. Schuller claimed that during his drive to Nebraska he was shot at and attacked with grenades but did not suffer any injuries.

While in Nebraska, Schuller visited his sister. She testified that Schuller seemed to be experiencing visual and auditory hallucinations at the time of the visit, telling her that people were "following him" and telling him to shut up. His sister also reported that Schuller appeared to be in fear for his life and was uncharacteristically aggressive.

Schuller eventually decided to drive back to California. One day before the killing of W.T., Nevada police officers stopped Schuller on suspicion of reckless driving. Schuller told the officers that three men were trying to attack him with needles. He further stated that "the entire police force and agencies of the world [we]re letting Satan" do something and commented on the "fake light." At one point, an officer stepped on an aluminum strip that produced a popping noise, causing Schuller to believe a gunshot had been fired and that the officers were trying to hurt him. The officers eventually allowed Schuller to go, believing he was not a danger to himself or others.

Schuller testified that he arrived back in California on March 20 and went straight to W.T.'s house. After the two had shared several drinks, W.T. asked Schuller to get rid of a firearm that Schuller had stored at W.T.'s house. W.T. retrieved the gun and placed

5

it in a case on the kitchen table, asking Schuller to take it with him when he left the next morning.

Schuller explained that he "ended up sharing the light with" W.T., who initially experienced "over-whelming joy." Later in the night, however, Schuller shared the light with W.T. again, but was unable to get the light back. Schuller testified that W.T. looked outside with a smile on his face and said, "See, I told you I could take it from him." W.T. then pulled a knife from a kitchen drawer. Schuller "tried to leave through some French doors, but they wouldn't open. He then ran to the kitchen table to put something between him and W.T.," and W.T. tried to "stab at [Schuller]."

Schuller grabbed the gun on the kitchen table and asked W.T. if he was "Lucifer," to which W.T. responded yes. Schuller stated that he then put the gun down and said, "Yeah, right, . . . You're not Lucifer." As soon as Schuller set the gun down, W.T. "went for the gun and raised the knife." Schuller then picked the gun up again, took a step back, and "pulled the trigger." Schuller said he was "in fear for [his] life" because W.T. had a "big knife."

Schuller was uncertain whether he fired more than one shot but recalled the bullet hitting W.T. "right in the head and he went down to the ground. The knife . . . f[ell] out of his hand." Schuller testified that W.T. then "pushed himself up off the ground." Schuller described W.T.'s movement: "It was all like one motion like push yourself up, getting to your knees, grabbing something at the same time." Schuller could not recall how the knife got back on the table, and testified, "I don't remember if he grabbed the knife and somehow it got back on the table but he was like pushing himself up." W.T.'s actions "shocked" Schuller, causing him to "jump[] back" and "pull[ the trigger] four or five more times." When asked why he shot W.T. four or five more times, Schuller testified he was "scared" because W.T. had yelled, "You f'd up" and was then able to "push himself up . . . off the ground . . . without hesitation."

6

After firing the second round of shots, Schuller retrieved W.T.'s cell phone and attempted to call 911. However, he was unable to unlock the phone, which kept ringing. Schuller then heard a loud gasp and saw W.T.'s dentures fly at him, which scared Schuller again, causing him to "pull the trigger three more times." Schuller continued trying to call 911 with W.T.'s phone, but the phone kept ringing so Schuller shot it several times. Schuller finally decided to leave the residence but felt "a hundred thousand demons [sweep] through" him. Schuller turned and saw a demon enter W.T.'s body. Schuller attempted to "kill the demon" by pouring gasoline on W.T.'s body and igniting it. Schuller then left the home to travel to Monterey.

On cross-examination, Schuller admitted that in his initial statements to the police he never claimed to have shot W.T. in self-defense because he "did not know who to trust." Instead, Schuller had told the police W.T. was gay and trying to come on to him.

c.      *Prosecution's Rebuttal Witnesses*

A detective testifying as a rebuttal witness for the prosecution explained that he had monitored calls Schuller made to friends and family from jail after his arrest. According to the detective, Schuller appeared "lucid and normal" during his initial conversations about the case. In subsequent calls Schuller revealed that he intended to pursue a "mental health defense." After that intent became clear, the detective noticed a difference in how Schuller talked in his conversations. He began speaking "much more" about conspiracy theories, including "law enforcement conspiring against him" and "angels and demons . . . [a]ffecting things in his everyday life."

The prosecution also called two forensic psychologists who had been appointed by the court to evaluate Schuller. The first psychologist opined that defendant was exaggerating or feigning psychiatric distress. The psychologist did not believe Schuller was mentally ill but acknowledged that his extensive drug use could have caused hallucinations. The psychologist testified that Schuller's decision to burn W.T.'s body

7

and then attempt to evade police demonstrated knowledge of wrongdoing and an understanding of consequences.

The second psychologist likewise testified that she believed defendant was "malingering or exaggerating his mental health condition." The psychologist noted that during Schuller's initial recorded jailhouse conversations, he had discussed his case at length but made no mention of any psychiatric symptoms, hallucinations, seeing demons or any of the problems that he later described to the psychologist.

### 2. *Defense's Request for Instruction on Imperfect Self-Defense*

Prior to closing argument, the defense requested an instruction on voluntary manslaughter based on imperfect self-defense. The prosecution opposed, arguing that Schuller's testimony demonstrated that any alleged belief in the need to defend himself was the result of delusions, and thus amounted to a claim of insanity that could only be raised in the sanity phase of the trial. (See *People v. Elmore* (2014) 59 Cal.4th 121, 130, 146 (*Elmore*) ["the doctrine of unreasonable self-defense is [not] available when belief in the need to defend oneself is entirely delusional"; such a claim must instead be raised at "a sanity trial"].)

The defense, however, argued that Schuller's imperfect self-defense claim was not based on "purely delusional belief[s]" (*Elmore, supra*, 59 Cal.4th at p. 130), but rather was supported by the objective circumstances of the crime scene. Specifically, Schuller had testified that W.T. attempted to attack him with a knife while reaching for a firearm, and a knife and an empty gun case had been recovered from the kitchen table. According to the defense, while Schuller's testimony suggested his reactions to W.T. may have been "distorted by mental illness," there was nonetheless sufficient evidence to support a finding that he mistakenly believed the actual circumstances required him to act in self-defense. (See *id*. at p. 146 ["defendants who mistakenly believed that actual circumstances required their defensive act may argue they are guilty only of voluntary manslaughter, even if their reaction was distorted by mental illness"].)

8

The trial court ultimately sided with the prosecution, concluding that Schuller's testimony demonstrated his "reaction [to W.T.] was produced by the mental disturbance alone, which is the very thing that the cases talk about as being for the sanity phase, not for the guilt phase." The court acknowledged that a knife was found on the kitchen table but concluded that was insufficient to warrant an instruction on imperfect self-defense. The court did, however, instruct the jury that it could consider evidence of Schuller's mental condition "in deciding whether [he had] acted with deliberation and premeditation."

### 3. *Closing Argument and Jury Verdict*

Because Schuller had admitted that he intentionally shot W.T. in the head and the trial court had denied his request for an instruction on imperfect self-defense, the sole issue contested at closing argument was whether Schuller should be found guilty of premeditated first degree murder or second degree murder.

The prosecution emphasized to the jury that "self-defense was [not] an option . . . in this case" and that there was "no legal self-defense argument that [it could] even consider." The prosecution explained that in light of the absence of any such possible defense, the element of malice had been conclusively established by Schuller's admission that he repeatedly shot W.T. in the head. The prosecution further contended that the manner of the killing and Schuller's subsequent attempts to burn the body and evade the police showed he had acted not only with malice, but also with deliberation and premeditation. Finally, the prosecution discussed how the jury should evaluate the "mental health evidence," noting that multiple psychologists had testified Schuller appeared to be exaggerating his condition as a means to avoid criminal liability.

In response, the defense argued that Schuller's testimony showed he was suffering from a "severe mental health crisis" that had caused him to believe W.T. was "a physical threat . . . and that is why he killed." The defense theorized that Schuller's "delusional state of mind" had led him to believe that "W.T. was allied with forces of darkness" and

9

"react[] to things that weren't there."  According to Schuller, this evidence raised at least a reasonable doubt whether his "paranoid beliefs" had caused him to act out of a perceived fear for his life rather than with deliberation and premeditation.

The jury found Schuller guilty of first degree murder.  Following the determination of guilt, the trial proceeded to the sanity phase.  The jury was unable to reach a decision on that issue and a second jury was empaneled.  The second jury found that Schuller was legally sane at the time of the shooting.

B.      *Court of Appeal Proceedings*

In his direct appeal, Schuller asserted the trial court erred in refusing to instruct the jury on voluntary manslaughter based on imperfect self-defense, because substantial evidence demonstrated he had an actual, albeit unreasonable, belief in the need for self-defense.  We concluded the trial court erred in refusing the instruction because, "[w]hile defendant's testimony included evidence of delusion, his account pertaining to the actual shooting was not *entirely* delusional and thus provided substantial evidence of an actual but unreasonable belief in the need for self-defense." (*Schuller I, supra*, 72 Cal.App.5th at p. 233.)  We then evaluated the error under the prejudice standards of *People v. Watson* (1956) 45 Cal.2d 818, 836 and *Chapman* (*Schuller I, supra*, at pp. 237-239) and concluded under either standard, the error was harmless "given the overwhelming evidence that defendant was not acting under any form of self-defense" (*id.* at p. 238). We affirmed the judgment.

C.      *Supreme Court Proceedings*

The Supreme Court granted review and held the appropriate standard to evaluate prejudice when the record contains substantial evidence of imperfect self-defense is under the federal *Chapman* standard; that is, the reviewing court is required to reverse the conviction unless it concludes "no 'rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had a reasonable doubt regarding the findings necessary to convict the defendant [absent the instructional error].' " (*Schuller*

10

*II, supra*, 15 Cal.5th at p. 244.) The Supreme Court also held our analysis did not comport with that standard. (*Ibid.*) The Supreme Court noted we had identified evidence that " 'undercut [defendant's] claim of self-defense' " or " 'did not entirely align with his story.' " (*Id.* at p. 262.) "The [appellate] court's discussion suggests that rather than assess whether any reasonable jury could have credited Schuller's claim of imperfect self-defense 'given the . . . actual verdict and the state of the evidence' [citation], the [appellate] court performed its own weighing of the evidence and its own assessment of witness credibility. It was not the [appellate] court's role, for example, to decide whether Schuller's failure to raise the issue of self-defense in his initial conversations with police demonstrated that his trial testimony was not true or credit the psychologists' disputed conclusion that Schuller was malingering. While much of the trial evidence certainly casts doubt on Schuller's claim of imperfect self-defense, it was ultimately the jury's role, not that of the reviewing court, to assess whether such evidence showed beyond a reasonable doubt that Schuller did not 'kill[ ] with an actual but unreasonable belief in the need for self-defense against imminent death or great bodily injury.' " (*Ibid.*)

Additionally, our Supreme Court explained that a proper application of *Chapman* precludes finding both that failure to give an imperfect self-defense instruction was harmless beyond a reasonable doubt based on overwhelming evidence and that substantial evidence supports the instruction. (*Schuller II, supra*, 15 Cal.5th at p. 263.)

Accordingly, our Supreme Court reversed the judgment affirming Schuller's conviction and remanded the matter to us with instructions to reconsider whether the failure to instruct on imperfect self-defense was harmless beyond a reasonable doubt. (*Schuller II, supra*, 15 Cal.5th at p. 263.)

## II. DISCUSSION

The sole issue for us on remand from our Supreme Court is whether the trial court's denial of Schuller's request for an imperfect self-defense instruction was harmless beyond a reasonable doubt.

11

In supplemental briefing, the People argue no reasonable jury would have found Schuller acted in imperfect self-defense as: (1) the jury's finding of premeditation and deliberation shows the jury rejected a finding that Schuller acted in imperfect self-defense; (2) there is no evidence at the time of the fatal shot Schuller actually believed that immediate deadly force was necessary against W.T.; and (3) firing fatal shots at a disabled assailant precludes a finding of imperfect self-defense.

" 'Generally, the intent to unlawfully kill constitutes malice.' " (*Schuller II, supra*, 15 Cal.5th at p. 252.) Imperfect self-defense negates the element of malice and limits the offense to manslaughter. (*Ibid.*) When imperfect self-defense is at issue, the People must "prove beyond a reasonable doubt not only that the defendant committed an unlawful, intentional killing, but also that the defendant did not kill in an actual but unreasonable belief in the need for self-defense." (*Id.* at p. 254.) When, as here, there is substantial evidence of imperfect self-defense, the failure to instruct on the theory amounts to an incomplete instruction on an actual element of murder, namely malice. (*Id.* at pp. 244-245.)

In *Schuller II,* our Supreme Court concluded the instructional error at issue here is one that misdescribes the elements of the charged offense and as such the error was subject to review under the *Chapman* standard. Our Supreme Court clarified the *Chapman* standard requires "reversal unless the reviewing court is persuaded that ' " '[n]o reasonable jury' " ' would have found in favor of the defendant on the missing fact, given the jury's actual verdict and the state of the evidence' [citation]. When making this evaluation, the reviewing court ' "does not . . . 'become in effect a second jury to determine whether the defendant is guilty.' [Citation.] Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." ' [Citation.] As stated by our high court, 'safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the

12

court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless.' " (*Schuller II, supra*, 15 Cal.5th at p. 261.)

A.    *Jury's Premeditation and Deliberation Finding*

The People argue the jury's finding of premeditation and deliberation was necessarily a rejection that Schuller acted under the effects of delusions and hallucinations; and therefore, no reasonable jury would have found he actually, but unreasonably, believed in the need to defend himself.  As the People reason, defense counsel's closing argument was that Schuller acted in a delusional state of mind when he killed W.T. and therefore did not premeditate the killing.  The jury rejected this defense and found Schuller carefully weighed the considerations for and against his choice, and knowing the consequences decided to kill W.T.  The People conclude that this verdict is "completely at odds with a finding that while in a delusional state [Schuller] actually believed he needed to act with lethal force to save his life."

The jury was instructed that to find premeditation and deliberation, there must be proof that Schuller decided to kill after weighing the consequences of that choice and before completing the acts that caused death; that a decision to kill made rashly, impulsively or without careful consideration was not deliberate or premeditated; and that a cold calculated decision to kill can be reached quickly.  (CALCRIM No. 521.)  An instruction on imperfect self-defense would have informed the jury that Schuller acted in imperfect self-defense if he: actually believed he was in imminent danger of being killed or suffering great bodily injury and actually believed the immediate use of deadly force was necessary to defend against that danger; but at least one of those beliefs was unreasonable.  And, the instruction would have instructed the jury that to convict Schuller of murder, the People were required to prove beyond a reasonable doubt that Schuller was not acting in imperfect self-defense.  (CALCRIM No. 571.)

13

As the People acknowledge, a jury's finding that a defendant acted with premeditation and deliberation does not necessarily preclude a finding that he honestly but unreasonably believed he needed to act in self-defense. "Imperfect self-defense does not require a rash or impulsive killing. Rather, the requirements of self-defense are consistent with a killing undertaken with premeditation and deliberation. A defendant who acts in self-defense must honestly believe that he or she is 'in imminent danger of being killed or suffering great bodily injury' and that 'the immediate use of deadly force [is] necessary to defend against the danger.' (CALCRIM No. 571.) These requirements imply that a defendant has evaluated both the danger present and alternate options for escape or deescalation and has concluded that ' "imminent danger to life or great bodily injury" ' requires the use of deadly force." (*Schuller II, supra*, 15 Cal.5th at p. 265, (conc. opn. of J. Liu).) As Justice Liu concluded, Schuller's imperfect self-defense claim meets these requirements. Schuller "testified that after unsuccessfully attempting to flee W.T.'s apartment and then seeing W.T. reach for a gun and attempt to attack with a knife, he determined that responding with deadly force was necessary. [Citation.] Schuller's testimony supports a conclusion that he premeditated—that is, he 'decided to kill before completing the act[ ] that caused death,' a decision that 'can be reached quickly'—and that he deliberated by 'carefully weigh[ing] the considerations for and against' his decision to kill. (CALCRIM No. 521.) A juror who credited his testimony could rationally conclude both that he acted with premeditation and deliberation *and* that he honestly though unreasonably believed he needed to act in self-defense." (*Schuller II, supra*, 15 Cal.5th at p. 265 (conc. opn. of J. Liu).)

14

The People's argument to the contrary characterizes Schuller's imperfect self-defense claim as a claim of "delusional self-defense"[2] and asserts Schuller's claim of imperfect self-defense was inextricably bound with his claims of hallucinations and delusions. In essence, the People reiterate the argument made by the prosecutor in the trial court opposing giving the imperfect self-defense instruction and to us on the original appeal. We rejected this argument on appeal when we concluded that the trial court erred in failing to instruct on imperfect self-defense because, "[w]hile defendant's testimony included evidence of delusion, his account pertaining to the actual shooting was not *entirely* delusional and thus provided substantial evidence of an actual but unreasonable belief in the need for self-defense." (*Schuller I, supra*, 72 Cal.App.5th at p. 233.)

Moreover, the People's argument ignores the fact that because of the trial court's refusal to give the imperfect self-defense instruction, the sole contested issue was whether Schuller should be found guilty of premeditated first degree murder or second degree murder. (*Schuller II, supra*, 15 Cal.5th at p. 249.) There was no argument regarding malice. Instead, the prosecutor argued malice had been conclusively established as Schuller admitted he intentionally shot the victim and failed to proffer any legally valid theory of self-defense. In turn, defense counsel's argument was limited to arguing Schuller's "perceptions of W.T.'s conduct raised a reasonable doubt as to whether the killing was committed with deliberation and premeditation. In other words, the lack of instruction forced Schuller to concede, and enabled the prosecution to affirmatively argue, that Schuller's belief in the need to defend himself was entirely *immaterial* to the jury's determination of malice." (*Id.* at p. 255.)

---

[2] A claim of self-defense based *solely* on delusion ("delusional self-defense") is more than a claim of imperfect self-defense, it is a claim of legal insanity. (*Elmore, supra*, 59 Cal.4th at p. 145.)

15

Without an instruction on imperfect self-defense, the jurors were never informed that if they had "a reasonable doubt whether [defendant] was operating under an actual but unreasonable belief in the need for self-defense, they were *required to acquit him of murder for lack of malice.*" (*Schuller II, supra*, 15 Cal.5th at p. 255, italics added.) The misinstruction thus precluded the jury from making a factual finding as to an "actual element," malice, necessary to prove the offense. We see nothing in the jury findings that fills this void.

Schuller contested an element of the offense, malice, and raised sufficient evidence to support a finding that he acted without malice (in imperfect self-defense), that is a finding contrary to the jury's finding. We cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the instructional error. Accordingly, we cannot find the error harmless under *Chapman*. (*Schuller II, supra*, 15 Cal.5th at p. 261.)

B.      *Actual Belief in Need to Use Deadly Force/Disabled Assailant*

The People also claim there is no evidence that Schuller actually believed in the need to use deadly force and that his firing shots at a disabled assailant precluded a finding of imperfect self-defense. In these claims, the People argue that as to the second round of shots, there was not evidence from which a reasonable jury could find Schuller actually believed in the immediate need to use deadly force against W.T.

In making this evaluation, we are constrained by our Supreme Court's directive that we must not weigh the evidence or in effect become a second jury determining guilt and instead must limit our analysis to the " 'actual verdict and the state of the evidence.' " (*Schuller II, supra*, 15 Cal.5th at p. 261.) So constrained, we cannot conclude beyond a reasonable doubt that the jury would have reached the same verdict absent the instructional error. (*Ibid.*) Schuller testified W.T. attempted to get the gun and twice attempted to attack Schuller with a knife. These attempts made Schuller fear for his life, so he shot W.T. Despite being shot in the head, without hesitation, W.T. pushed himself

16

up, possibly grabbed something, and yelled, "You f'd up." Schuller was shocked and scared, so he shot W.T. four or five more times. If the jury credited this testimony, it could have rationally concluded Schuller actually believed the danger from W.T. had not passed after the first shot; and that Schuller's actions were taken in the actual, albeit unreasonable, belief in the need to defend himself from imminent danger of death or great bodily injury. Nothing in the jury's verdict demonstrates it would have necessarily rejected this claim. Accordingly, we cannot find the error harmless under *Chapman.*

### III. DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for further proceedings consistent with his opinion.

/S/

_____
RENNER, J.

We concur:

/S/

_____
HULL, Acting P. J.

/S/

_____
WISEMAN, J.[*]

---

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.